THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HECTOR RODRIGUEZ, Defendant-Appellant.

Second District   No. 2—95—0089

Opinion filed May 30, 1997.

Robert P. Will, Jr., of Will & Briscoe, Ltd., of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (John X. Breslin and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Hector Rodriguez, was charged by indictment with two counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1994)), two counts of armed violence (720 ILCS 5/33A—2 (West 1994)), and two counts of aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1994)). The State nol-prossed the armed violence counts and one of the aggravated battery counts. A jury found defendant guilty of first degree murder and aggravated battery with a firearm. The trial court sentenced defendant to concurrent terms of 28 years' imprisonment for each offense. Defendant now appeals his convictions and sentence. We reverse and remand.

On June 3, 1994, Javiar Cancino was shot and killed in front of a church across the street from the People's Market in Waukegan. On June 5, 1994, Arturo Mendez and Alberto Vargas were shot from a passing van while they stood in front of the People's Market. Mendez was killed and Vargas partly paralyzed. On June 6, 1994, defendant was charged as a juvenile with obstruction of justice and unlawful possession of a firearm stemming from the June 5 shooting. On June 10, 1994, the State filed a petition to transfer the matter to the circuit court of Lake County. On June 24, 1994, a tentative plea agreement was presented to the juvenile court. According to the plea, defendant would plead guilty to the unlawful possession of a firearm charge and offer truthful testimony and a recorded statement to be used against others indicted for the shooting. In exchange, the State declined to seek incarceration in the Department of Corrections and agreed to dismiss its transfer petition. On July 11, 1994, defendant entered his plea, and the State recommended that he not be sentenced to the Department of Corrections and released pending sentencing. On August 17, 1994, defendant was indicted with the offenses charged in this case.

Prior to the commencement of trial, the trial court granted the State's motion to join defendant's case with that of A.P., another minor charged in the shooting. The defendants were tried before separate juries.

The trial commenced on September 20, 1994. Jihad Abdel Jaber testified that he is the manager of the People's Market in Waukegan. At approximately 2:30 p.m. on June 5, 1994, Jaber noticed "a whole bunch of people standing outside the door hanging around." One boy came into the store and purchased a can of soda. Shortly thereafter, Jaber heard six gunshots. The boy who had purchased the soda returned to the inside of the store after being shot, fell on the floor, and died. The other victim was outside the store. On cross-examination, Jaber admitted that he did not see the shooting occur.

Dr. Nancy Jones, a forensic pathologist employed as a coroner's physician in Lake County, testified that she performed an autopsy on Arturo Mendez. According to Dr. Jones, Mendez died as a result of a single gunshot to his back. On cross-examination, Dr. Jones stated that the bullet hit Mendez in the middle of his back and travelled upward through his body. As a result of the bullet's path, Dr. Jones opined that Mendez was running, ducking, or leaning forward at the time he was shot.

Dr. Thomas Braniff, an emergency room physician, testified that he treated Alberto Vargas for a gunshot wound on June 5, 1994. Vargas was shot once in his "left back." After entering Vargas' back, the bullet lodged against his spine. As a result of the serious nature of his wound and the danger of paralysis, Vargas was flown by helicopter to a Milwaukee hospital for treatment.

Detective James McCarthy of the Waukegan police department stated that, after investigation of the crime scene on June 5, 1994, four bullet casings were recovered from the street in front of the People's Market.

Officer David Deprez of the Waukegan police department testified that at approximately 2 a.m. on June 6, 1994, he and other police officers were with defendant when he told them that he had given a gun involved in the June 5 shooting to his ex-girlfriend. Thereafter, the officers and defendant went into his ex-girlfriend's home and retrieved the gun from underneath her mattress. According to Officer Deprez, defendant told him that he had received the gun from Freddy Zuniga.

William Wilson, a forensic scientist with the Northern Illinois Police Crime Laboratory (the lab), testified that another member of the lab, Robert Wilson, tested the weapon recovered in this case. Robert Wilson concluded that the bullet recovered from Arturo Mendez' body was consistent with having been fired from the recovered weapon, a .22-caliber handgun. Additionally, the cartridges found at the scene of the crime were consistent with having been fired from the same weapon. Based on his expertise, William Wilson testified

that bullets with these characteristics could have come from the type of gun recovered in this case, a .22-caliber Jennings semi-automatic pistol.

Alberto Vargas testified that at approximately 2 p.m. on June 5, 1994, he was about to enter the People's Market when he saw a van approach and stop. He was then shot by someone in the van. After he was shot, he could not feel his legs. Today, he has "some pain in [his] stomach and in [his] back." He is able to walk, but it is difficult and he often falls.

Mark Davila testified that on June 5, 1994, he attended a meeting of the Latin Lovers gang. Because he was not a gang member, Davila was not allowed to go into the actual meeting. After the meeting ended, Davila entered Andres Delgado's van with approximately 10 other people. Jose Delgado, Andres' cousin, was in the front passenger seat. Defendant was in the middle seat along with Jesus Zuniga. Freddy Zuniga, David Rodriguez (defendant's brother), and Carlos Arroyo were in the back. A.P. was also in the van. There were three other people in the van, including someone named Isaac.

Davila testified that as they drove through Waukegan, "someone asked for the gun." Carlos Arroyo told Davila where the gun was in the van. Davila then picked it up and passed it to Isaac. According to Davila, Isaac then passed the gun either to A.P. or defendant. At that point, the van stopped. A.P. stood up, waved the gun out the passenger window, and shot twice. The van then turned and defendant "shot the other gun." They then drove off, stopped the van at a different location, and got out. At that point, Davila heard defendant state that "he had hit some of them."

Davila recalled a statement that he had made to Waukegan police officers on the night of June 6, 1994. In that statement, Davila indicated that either Freddy Zuniga or defendant could have been the shooter because both were standing near the van's passenger window. Davila stated that Isaac gave the gun either to Freddy Zuniga or defendant. According to Davila, he included Freddy Zuniga in his initial statement because the police repeatedly told him that "Freddy already admitted to saying that he did it." However, at trial, Davila recanted and said that he and Freddy Zuniga were in the back of the van at the time defendant and A.P. were shooting.

On cross-examination by A.P., Davila admitted that his initial statement to the police was untruthful, despite the presence of his signature and the words "voluntary statement" on it. While he stated that the police did not "give him any trouble," Davila testified that they "yelled" at him and kept him in a room. According to Davila, the police told him to "just fall in line" and give a statement. Davila

reiterated that he gave his statement to the Waukegan police after they told him that Freddy Zuniga had already confessed to the shooting. Davila admitted that, in exchange for his truthful testimony in this case, the murder charge against him was reduced to aggravated discharge of a firearm. Therefore, while his statement to the Waukegan police was untruthful, his testimony in court was in fact truthful. Finally, according to Davila, after they left the scene of the crime in the van, defendant said, "I fired all the shots."

Defendant's cross-examination of Davila focused on Freddy Zuniga's alleged friendship with Javiar Cancino, the boy killed across the street from the People's Market on June 3, 1994. Davila stated that Zuniga did not tell him that he was upset by Cancino's death, that he "wanted to get even," or that he "wanted to do some shooting for himself." Davila then reiterated that the police forced him to make his statement on June 6, even though he signed the statement.

Vanessa Vasquez testified that she was in the van involved in the June 5 shooting with approximately 10 other people, including her younger brother Isaac. When she made a statement to the Waukegan police on June 7, 1994, she told them that A.P. "fired off a couple of rounds" from the van. In her statement, she also said that "someone else had a gun *** and then I heard some more shots being fired." However, in her testimony at trial, she stated that only A.P. fired a gun out of the van and that no one else fired any shots. On cross-examination, she admitted that she did not see defendant shoot a gun on June 5, 1994.

Andres Delgado testified that he was the driver of the van involved in the June 5 shooting. He drove the van until it reached the vicinity of the People's Market. He stopped the van and then watched as defendant stood up and began shooting out of the passenger window.

On cross-examination by A.P., Andres stated that defendant was the only individual to fire a gun on June 5. He admitted that in his earlier statement to the Waukegan police he identified Freddy Zuniga as the shooter because the police told him to do so. He further admitted that, in exchange for his testimony, the murder charge against him was dismissed and he pleaded guilty to aggravated discharge of a firearm.

On cross-examination by defendant, Andres reiterated that he implicated Freddy Zuniga in his statement of June 6, 1994. However, that statement was untrue. Finally, Andres stated that when he heard shots being fired, he turned and saw defendant at the passenger window.

Jose Delgado testified that he is Andres' cousin. On June 5, 1994,

he was present at a meeting of the Latin Lovers gang. After the meeting ended, he left with his cousin in the van to pick up others. He was seated in the front passenger seat. As the van turned onto the street in front of the People's Market, he observed some members of the Kings gang. He then heard a gunshot and ducked down away from the window. He then looked up and saw defendant shooting out of the open passenger window. Thereafter, they drove away in the van and stopped in a nearby alley. Defendant then told Delgado that "I think I hit him." Jose admitted that on June 6 he told the police that Freddy Zuniga had been the one firing out of the passenger window. He provided that statement because the police had previously shown him Zuniga's confession.

On cross-examination by A.P., Jose reiterated that he saw defendant, and not A.P., shoot a gun out of the van's window. Rather than telling the police the truth on June 6, he told them "what they wanted to hear." As part of his untruthful initial statement, Jose said that "after the first shot I ducked down and [A.P.] was leaning over the top of me and I think he was shooting too." He recanted that statement and stated that he saw only one gun in the van on the day of the shooting. Finally, when he looked up after hearing the first shots, A.P. was in the back of the van.

On cross-examination by defendant, Jose reiterated that his first statement to the police, in which he did not implicate defendant, was not free and voluntary. He stated that the police "put words in [his] mouth" regarding Freddy Zuniga as the shooter. However, his second statement, in which he implicated defendant, was freely and voluntarily made to the authorities.

Jesus Zuniga testified that he attended the Latin Lovers gang meeting on June 5, 1994. After the meeting ended, he left in the van and was being driven home. He was in the back of the van. Zuniga had a .22-caliber gun with him and handed it to defendant as they approached the People's Market. The people in the van then observed some "Kings" on the street in front of the market. At that point, defendant moved up in the van toward the front passenger window. Zuniga then "ducked because [he] pretty much knew what [defendant] was going to do." Zuniga then heard "four or five" gunshots. As the van sped off, Zuniga watched defendant "put that gun away in his pants." Defendant then remarked that "I think I got one of them motherf-----s." Zuniga admitted that, in his statement to the Waukegan police given on the night of June 5, he stated that Freddy Zuniga had committed the shooting. Jesus stated that he implicated Freddy Zuniga because the police said that he had already confessed.

On cross-examination by A.P., Jesus reiterated that, in his later

statement, which was truthful, he did not identify A.P. as the shooter. He initially identified Freddy Zuniga and A.P. as the shooters because he "followed along with what the police told" him. Further, Jesus admitted that he brought the .22-caliber gun into the van and that it was the only gun in the van on the day of the shooting. He also admitted providing truthful testimony in exchange for his guilty plea to aggravated discharge of a firearm. On cross-examination by defendant, Jesus stated that the police did not force him to make his initial statement. In that statement, Jesus said, "I handed the .22 to Freddy ***." Jesus was further cross-examined about his plea agreement with the State. He admitted that in his first statement he did not mention anything about defendant.

At the conclusion of Jesus Zuniga's testimony, the following colloquy occurred:

"MR. RITACCA [defendant's counsel]: Judge, I don't know what to do, but I think that our defenses have really become antagonistic at this time.

* * *

THE COURT: See, I don't think so because in my mind all of this testimony would have come out regardless because if these same witnesses would have been called against [defendant] in a single trial at which time the State would have put on the evidence they did, you would have put on the other statements, and then the State would have begun to challenge those statements probably in a similar fashion in the way that [A.P.] is.

* * *

THE COURT: Quite frankly, I don't see the problem because as I see, the State would be impeaching or has impeached to some extent those statements anyway, and that's the State's theory that those statements are lies. That's [A.P.'s] theory, and yours is that the later statements are lies. Somebody's theory is that it's all a bunch of lies.

MR. RITACCA: When can you make that decision? When is the statement true or false?

THE COURT: That's why we have all these fine citizens to do that for us."

The State then continued with its case in chief.

Arlene Carrion testified that on June 5 or 6, 1994, she became aware that Freddy Zuniga was arrested for murder in connection with the shooting. In mid-July, she called defendant several times and recorded their telephone conversations on her answering machine. During one of these conversations with defendant, he told her that he had committed the shooting. Defendant also told Carrion that Freddy Zuniga had not committed the shooting. She testified

that she recorded their conversations of her own accord; she had no contact with the police or the State's Attorney's office before recording her conversations with defendant. The jury then heard the taped conversation between Carrion and defendant. On cross-examination, Carrion admitted that she did not tell defendant that she was recording their conversations. She stated that she recorded her conversations with defendant because "after [she] found out Jesus and Freddy and Andres were going to get lifetime sentences for something [defendant] did I decided maybe it would work if I did record a conversation to see if I could get anything out of him." In Carrion's opinion, defendant "killed somebody and blamed [her] best friend for it."

After the State rested its case in chief, defendant made a motion for mistrial based on the introduction of the audio tape of the conversation between Carrion and defendant. The trial court stated that the tape was not "overwhelmingly prejudicial or inappropriate for the jury to have heard" and denied defendant's motion. The trial court also denied defendant's motion for a directed verdict. A.P. then proceeded with his case in chief. At its conclusion, defendant began his case in chief.

Detective Donald Meadie of the Waukegan police department testified that, when he interviewed Jesus Zuniga on June 5, 1994, Jesus told him that he gave Freddy Zuniga a .22-caliber handgun just prior to the shooting. Jesus then told Detective Meadie that he observed Freddy and A.P. shoot at the victims from the van. Jesus never indicated to Detective Meadie that defendant had been a shooter on June 5.

Detective Artis Yancey of the Waukegan police department testified that he interviewed Freddy Zuniga in connection with the June 5 shooting. After his interview with Freddy, Detective Yancey and other officers travelled to Freddy's home. In Freddy's bedroom, they located a box of ".22 automatic cartridges," but they did not recover a weapon.

Luis Marquez, a detective with the Waukegan police department, testified that he interviewed Andres Delgado in connection with the June 5 shooting. Delgado told Detective Marquez that he observed Freddy Zuniga lean out of the van's passenger window and fire several shots. Delgado told Detective Marquez that Zuniga had used a chrome .22-caliber handgun. Delgado never indicated to Detective Marquez that defendant had been the shooter on June 5.

Officer David Deprez was recalled and testified that he interviewed Mark Davila on the morning of June 6, 1994. Davila told Officer Deprez that Freddy Zuniga and Javiar Cancino, the boy killed on June 3, had been friends. Davila also told Officer Deprez that he

saw defendant with the chrome .22-caliber handgun prior to the shooting, but that he did not see defendant fire the gun. In fact, Davila stated to Officer Deprez that Freddy Zuniga could have been the shooter because he was by the front window.

Defendant, who was 16 years old at the time of trial, testified in his behalf. On June 5, 1994, he went to a house where a gang meeting was being held, but he did not participate in the meeting because he was not yet a member of the Latin Lovers. At the end of the meeting, he entered Andres Delgado's van with several other people. He was seated on the floor in the rear of the van. As they were driving, people began talking about the June 3 shooting. They decided to drive by the church across the street from the People's Market in order to observe the scene. When they arrived at the scene, there was a shooting. Defendant heard the shots but did not see who fired the gun. However, he saw Freddy Zuniga with a gun. Defendant denied telling Mark Davila that he had shot someone.

According to defendant, Freddy Zuniga told him where he had hidden the gun. After Freddy was arrested, defendant found the gun and went to hide it at his ex-girlfriend's home. Defendant stated that he did not know that Arlene Carrion recorded their conversations in the middle of July. According to defendant, he was laughing, joking, and teasing on the tape because he was happy to be at home after approximately a month in jail. Finally, defendant stated that he did not commit the June 5 shooting.

On cross-examination, defendant confirmed that, in his recorded conversation with Carrion, he said that Freddy Zuniga "took the blame" for the June 5 shooting. However, when Carrion accused defendant of committing the shooting, he answered that "they don't know who did it. Freddy said he did it to get me off." Defendant stated that Freddy Zuniga was helping him because he had been hiding the gun for Freddy. Moreover, when Carrion told defendant that Freddy was "going to get charged for murder *** and he didn't even do it," defendant admitting answering "I know."

In rebuttal, the State called Freddy Zuniga. Zuniga testified that on June 5, 1994, after the gang meeting ended, he entered Andres Delgado's van and sat in the rear. He identified a chrome .22-caliber handgun as the weapon defendant fired on that day. Zuniga testified that, when he was first taken to the police station, he "thought it was cool to take the blame for [defendant] because he thought it wasn't so serious." However, he changed his mind after learning that Mendez had been killed. Zuniga stated that he did not shoot a gun on June 5, 1994. Finally, he stated that, in exchange for his truthful testimony in this case, he was not charged with murder.

On cross-examination by A.P., Zuniga indicated that he identified A.P. as another shooter when he gave his initial statement to the police. He admitted that his statement was untrue and that he never saw A.P. shoot a gun.

On cross-examination by defendant, Zuniga stated, "I didn't do nothing, so why should I spend the rest of my life [in jail] for something that [defendant] did?"

On September 23, 1994, the jury returned guilty verdicts as to two counts of first degree murder and one count of aggravated battery with a firearm. On November 4, 1994, after denying defendant's motion for new trial and hearing the testimony of several witnesses, the trial court sentenced defendant to concurrent terms of 28 years' incarceration for first degree murder and aggravated battery with a firearm. Defendant's motion to reconsider was denied and he filed this timely appeal.

Defendant has six contentions on appeal: (1) there was insufficient evidence to prove him guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm; (2) the trial court erred in granting the State's motion for joinder; (3) the trial court erred in denying his motion to suppress his tape-recorded conversations with Carrion; (4) the trial court erred in denying his motion to enforce a previously entered plea bargain; (5) the trial court erred in denying him his right to a public trial; and (6) the trial court abused its discretion in sentencing him.

Defendant's first contention is that the State failed to prove him guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm. Defendant argues that each of the State's witnesses, when first interviewed by the Waukegan police between June 5 and 7, 1994, identified either Freddy Zuniga or A.P. as the shooter. At that time, none of the witnesses identified defendant. Yet, each of these witnesses somehow identified defendant at trial as the perpetrator of the June 5 shooting. Therefore, defendant argues that the State's case was "premised entirely upon testimony from witnesses who were biased, suspect, impeached, contradicted, and otherwise not worthy of belief." Accordingly, defendant argues that there was insufficient evidence of his guilt.

■ We begin by noting that our standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Willer*, 281 Ill. App. 3d 939, 948 (1996). We do not substitute our judgment for that of the trier of fact on questions involving the weight of

the evidence or the credibility of the witnesses. *Willer*, 281 Ill. App. 3d at 948. It is the responsibility of the trier of fact to resolve conflicting testimony, weigh the evidence, and draw reasonable factual inferences. See *People v. Young*, 128 Ill. 2d 1, 51 (1989). A conviction will not be overturned unless the evidence is "so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375 (1992), citing *Collins*, 106 Ill. 2d at 261.

■ Even if we were to agree with defendant and find that none of the State's witnesses provided credible evidence of defendant's guilt, we would still find sufficient evidence of his guilt for several reasons. First, defendant admitted that he possessed the murder weapon after the shooting and that he hid it at his ex-girlfriend's home. A search of her home revealed the .22-caliber weapon that was used in the shooting. Second, in the tape-recorded conversation between Arlene Carrion and defendant, the following colloquy occurred:

"ARLENE: But they don't got no proof you did that, you did it right?

[DEFENDANT]: They don't know who did it, Freddie [Zuniga] said he did it, to get me off, all I'm getting charged with is for carrying the gun, and for hiding it. ***

ARLENE: Yeah, but that's f----d up then because he's going to get charged for murder and s--t and he didn't even do it.

[DEFENDANT]: I know.

ARLENE: But then again I don't want to see you get charged for murder either.

[DEFENDANT]: No one's talking still, huh?"

Later in their conversation, the following exchange occurred:

"ARLENE: They don't know that you did it right?

[DEFENDANT]: Who don't?

ARLENE: Your parents.

[DEFENDANT]: Yeah they know."

Thus, the jury could conclude that defendant told Carrion that Freddy Zuniga lied for him when in fact Zuniga did not commit the shooting and that defendant admitted his guilt in the shooting by telling Carrion that his parents knew of his actions. In light of this evidence, his possession of the murder weapon, his decision to hide that weapon with his ex-girlfriend, the evidence is not "so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375, citing *Collins*, 106 Ill. 2d at 261.

Defendant next contends that the trial court erred in granting the State's motion for joinder of his case with that of A.P. Defendant argues that he and A.P. took antagonistic positions with respect to

the witnesses who recanted their earlier statements to the police. According to defendant, A.P. attempted to demonstrate that the witnesses' earlier statements, in which they implicated A.P. and Freddy Zuniga, had been coerced and were therefore unreliable. In contrast, defendant attempted to demonstrate that the witnesses' earlier statements were reliable and that their trial testimony "was suspect due to prejudice and bias against the Defendant." Because of this antagonism between the codefendants, defendant now contends that he should not have been jointly tried with A.P.

■ A trial court may join two or more charges or defendants when the offenses charged are based on two or more acts that are part of the same comprehensive transaction. See 725 ILCS 5/111—4(a), 114—7 (West 1994). Joinder is appropriate where the offenses were part of a single occurrence or common scheme. *People v. Weston*, 271 Ill. App. 3d 604, 612 (1995). Joinder is inappropriate when "codefendants' defenses are so antagonistic that a joint trial would not be a fair one." *People v. Carvajal*, 241 Ill. App. 3d 886, 890 (1993), citing *People v. Byron*, 116 Ill. 2d 81, 92 (1987). We will not reverse a trial court's ruling on a motion for joinder absent an abuse of discretion. *People v. Marts*, 266 Ill. App. 3d 531, 542 (1994).

■ Illinois courts have recognized two independent sources of prejudice that necessitate separate trials. See *People v. Bean*, 109 Ill. 2d 80, 93 (1985). The first involves an interference with the constitutionally guaranteed right of confrontation. See *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968); *Bean*, 109 Ill. 2d at 93. The second, upon which defendant's contention is based, includes situations "when codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others." *Bean*, 109 Ill. 2d at 93; see *People v. Daugherty*, 102 Ill. 2d 533, 541-42 (1984); *People v. Bond*, 230 Ill. App. 3d 1086, 1089 (1992). In other words, such prejudice exists where "a codefendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *People v. Lee*, 87 Ill. 2d 182, 187 (1981). The mere apprehension of prejudice is not enough to conduct separate trials. *Bean*, 109 Ill. 2d at 92. There must be actual hostility between the defendants in order to necessitate separate trials. *People v. Mischke*, 278 Ill. App. 3d 252, 264 (1995). Actual hostility occurs when there is "true conflict, such that each defendant professes his own innocence and condemns the other." *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991), citing *People v. Adams*, 176 Ill. App. 3d 197, 200 (1988). It is not sufficient to require a severance where a codefendant's theory is inconsistent or contradictory to the defendant's theory. *People v. Coleman*, 223 Ill. App. 3d 975, 994 (1991).

According to our supreme court, the "fountainhead of this State's jurisprudence in this area" is *People v. Braune*, 363 Ill. 551 (1936). *Bean*, 109 Ill. 2d at 94. In *Braune*, each defendant "was protesting his innocence and condemning the other" by subjecting witnesses "to searching and critical cross-examinations by counsel for the antagonistic co-defendant." *Braune*, 363 Ill. at 555-56. The supreme court held that defendant's trial "was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other." *Braune*, 363 Ill. at 557.

■ In this case, we recognize that defendant and A.P. did not directly implicate each other as the perpetrator of the shooting. In other words, their defenses were not directly antagonistic in the traditional sense. See, *e.g., People v. Byron*, 116 Ill. 2d 81, 92-94 (1987); *Bean*, 109 Ill. 2d at 93-94; *Daugherty*, 102 Ill. 2d at 541-42. However, their defenses were antagonistic in a more subtle, yet still prejudicial manner.

A.P. contended at trial that the occurrence witnesses' initial statements in which they implicated Freddy Zuniga and/or A.P., and not defendant, were coerced and unreliable. In direct contrast, defendant maintained that those same statements were true and that the occurrence witnesses' trial testimony, in which they implicated defendant and not A.P., was untruthful. For example, Mark Davila, Andres Delgado, Jose Delgado, and Jesus Zuniga initially identified Freddy Zuniga and/or A.P. as the shooters. All recanted their initial statements during direct examination by the State and identified defendant as the shooter. On cross-examination by A.P., each emphasized the untruthfulness of his initial statement and the veracity of his trial testimony. Thus, defendant and A.P. presented antagonistic defenses with respect to the occurrence witnesses; by arguing on cross-examination that the witnesses were telling the truth at trial, A.P. was presenting evidence to defendant's jury that defendant was the shooter.

Furthermore, A.P.'s cross-examinations did nothing but reinforce the State's direct examinations. The State elicited testimony from the occurrence witnesses regarding their initial untrue statements to the Waukegan police, their subsequent recantations, and their now-true identifications of defendant as the shooter. Thus, defendant's jury heard testimony from two different parties, A.P. and the State, which implicated defendant. While A.P. did not take the stand and "point a finger" at defendant (see *Lee*, 87 Ill. 2d at 187), he did the next best thing: A.P. undercut defendant's defense that the occur-

rence witnesses initially told the truth and reinforced the State's impeachment of those witnesses with respect to their recanted statements. This case did not merely involve "inconsistent or contradictory" defenses by the codefendants. See *Coleman*, 223 Ill. App. 3d at 994. Instead, it involved the State having two bites at the apple of defendant's guilt because the trial court allowed the State to first impeach its witnesses as to their initial statements, and then to have those impeachments supported by A.P.'s cross-examinations in the presence of defendant's jury. The net result produced the State and A.P. on one side and defendant on the other with respect to the occurrence witnesses.

Although *Braune* is not directly on point because the codefendants there directly implicated each other, we believe that the facts of this case produced the type of contest *Braune* urges us to protect against. Rather than focusing only upon the State's case, defendant here was also defending against his codefendant's theory of the case. Such a trial is inherently unfair because defendant's jury could reasonably have chosen to believe that the occurrence witnesses initially lied to the police simply because such evidence was presented by two parties other than defendant. Under the unusual facts of this case, we therefore hold that defendant was denied his right to a fair trial.

Finally, we note that it appears that the trial court recognized at the outset of this case that, at least to some extent, defendant and A.P. would present somewhat antagonistic defenses. Our conclusion is supported by the trial court's determination to use separate juries for each defendant. However, the trial court seemingly disregarded its original concern by allowing A.P. to conduct his cross-examination in the presence of defendant's jury. By permitting this to occur, the trial court erred in not abiding by the multiple jury procedure as described in *People v. Johnson*, 149 Ill. 2d 118, 132-33 (1992), and *People v. Ruiz*, 94 Ill. 2d 245, 259-60 (1982). Accordingly, defendant was denied his rights under the sixth amendment (see U.S. Const., amend. VI) and is entitled to a new trial.

Although we are reversing defendant's conviction and remanding this case for a new trial, we will briefly address two of defendant's other contentions which may again arise: (1) whether the trial court erred in denying his motion to suppress his recorded conversations with Arlene Carrion; and (2) whether the trial court erred in holding that the State did not violate a prior plea bargain it had entered into with him.

■ First, defendant argues that, because Carrion recorded their conversations without his consent or knowledge, they should not have been introduced as evidence against him. Defendant bases his

argument on section 14—2(a) of the Criminal Code of 1961 (eavesdropping statute) (720 ILCS 5/14—2(a) (West 1994)). That section states that a person commits the offense of eavesdropping when he "[u]ses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all of the parties to such conversation." 720 ILCS 5/14—2(a) (West 1994). Because any evidence obtained in violation of this section is inadmissible at any trial (see 720 ILCS 5/14—5 (West 1994)), defendant argues the trial court erred in denying his motion to suppress.

■ The State argues that our supreme court's decision in *People v. Beardsley*, 115 Ill. 2d 47 (1986), is controlling. In *Beardsley*, the court interpreted the eavesdropping statute (720 ILCS 5/14—2(a) (West 1994)) and held that it does "not prohibit the recording of a conversation *by a party to that conversation.*" (Emphasis added.) 115 Ill. 2d at 56. *Beardsley* has been subsequently and repeatedly followed by the appellate court. See, *e.g., People v. Siwek*, 284 Ill. App. 3d 7 (1996); *People v. O'Toole*, 226 Ill. App. 3d 974 (1992).

Therefore, under the eavesdropping statute, it was not illegal for Carrion, a party to the conversation, to record her conversations with defendant. Therefore, the tape was properly introduced to the jury in this case.

■ Defendant's remaining contention is that the trial court erred when it determined that the State did not violate a prior plea bargain it had entered into with him. This contention requires a brief review of certain procedural facts.

On June 6, 1994, the State filed a petition for adjudication for wardship in which it charged defendant as a juvenile with obstruction of justice and unlawful possession of a firearm in connection with the shooting. On June 10, 1994, the State filed a petition with the juvenile court seeking a transfer of defendant's case to the circuit court of Lake County. On June 24, 1994, a tentative plea bargain was presented to the juvenile court. According to the plea's terms, defendant would plead guilty to the charge of unlawful use of a weapon and provide truthful testimony against those who had already been indicted in the circuit court in connection with the June 5 shooting. In exchange, the State would recommend that he not be sentenced to prison time and would dismiss its pending transfer petition. On June 28, 1994, defendant gave a recorded statement to the Waukegan police department.

On July 11, 1994, the plea bargain was formally presented to the juvenile court. After finding that defendant's plea was factually based, knowing and voluntary, the juvenile court accepted his admission of guilt, released him to home detention, and set the case for a

later disposition. On August 12, 1994, the State obtained a warrant for defendant's arrest in connection with Mendez' murder. On August 16, 1994, when defendant appeared before the juvenile court for disposition, the State withdrew its petition for wardship. On August 17, 1994, defendant was indicted for murder, armed violence, and aggravated battery with a firearm.

On September 16, 1994, defendant moved the trial court to enforce the plea agreement that he presented to the juvenile court on July 11. Defendant argued that he gave up his fifth amendment right against self-incrimination in exchange for the plea bargain before the State dismissed his case in juvenile court and had it transferred to the circuit court. As such, the State was precluded from charging defendant with any other offenses in connection with the shooting because of its agreement with defendant. Defense counsel conceded, however, that the plea bargain did not contain an agreement as to the State not charging defendant with any other offenses after his interview with the police. According to the State's Attorney, defendant did not implicate himself in the interview with the police. Rather, the State "developed the leads that lead [sic] [it] to charge [defendant] with murder from completely independent sources. From Arlene Carrion being one."

After hearing argument on the matter, the trial court stated that the plea did not contain a specific statement as to what the State "could or couldn't do after the defendant chose to talk to them." In other words, there was "no bargain the State has breached with respect to the murder charge." Accordingly, the trial court denied defendant's motion to bind the State to the previous plea agreement.

As he did at trial, defendant relies on *People v. Starks*, 106 Ill. 2d 441 (1985), and *People v. Pierson*, 230 Ill. App. 3d 186 (1992), for the proposition that the State is bound by the plea bargain it agreed to while the case was in juvenile court. In *Starks*, the defendant was convicted of armed robbery. On appeal, he argued that he had entered into a plea bargain with the State whereby he agreed to take a polygraph test before trial. According to the defendant, the State agreed to drop the charges against him if he passed the polygraph test. The supreme court found that such an agreement would be enforceable against the State if the defendant had passed the polygraph test and remanded the case to the trial court for an evidentiary hearing to determine whether such an agreement existed. *Starks*, 106 Ill. 2d at 452-53.

In *Pierson*, the State appealed the dismissal of its case against the defendant on the ground that the prosecutor had violated a plea agreement with the defendant. According to the agreement, the State

would not prosecute defendant for murder if he agreed to make a statement, which he did. The State later sought a second statement from the defendant. In exchange for the second statement, the prosecutor "orally offered the defendant total immunity from prosecution on any charge." *Pierson*, 230 Ill. App. 3d at 188. However, the State eventually charged the defendant with armed robbery. On appeal, the court held that the State's oral promise to the defendant was enforceable and was breached when he was charged with armed robbery. *Pierson*, 230 Ill. App. 3d at 191.

However, both *Starks* and *Pierson* are distinguishable from the case at bar. In *Starks*, the defendant surrendered his fifth amendment privilege against self-incrimination by submitting to the polygraph test. In contrast, defendant did not surrender his fifth amendment privilege against self-incrimination by giving a statement to the Waukegan police. We carefully reviewed defendant's videotaped statement to the Waukegan police made on June 29, 1994. The entire statement lasted approximately 10 minutes. Nothing defendant said remotely implicated himself as the shooter in the crime charged. Instead, he stated that he did not know who in the van called for the gun or who actually fired the weapon. Absent a showing that defendant surrendered a constitutionally protected interest in reliance on the plea agreement, the plea need not be enforced. See *People v. Raymond*, 202 Ill. App. 3d 704, 707 (1990).

Moreover, unlike in *Pierson*, where the State promised not to charge the defendant with *any* crimes after he provided them with information, the State in this case promised only to accept defendant's plea as to *one* charge—unlawful use of a weapon. There was never any mention, as defense counsel conceded, of the State not charging defendant with any subsequent offenses in exchange for his statement. Therefore, the State abided by its agreement in this case because defendant was not indicted for unlawful use of a weapon.

Finally, we reiterate that we have reviewed the evidence at trial and find it was sufficient for a fact finder to conclude that defendant was guilty beyond a reasonable doubt. We are not making a determination of defendant's guilt or innocence that is binding on retrial. See *People v. Spain*, 285 Ill. App. 3d 228, 241 (1996). Instead, our examination of the sufficiency of the evidence eliminates any risk that defendant would be subject to double jeopardy. *People v. Taylor*, 76 Ill. 2d 289, 309-10 (1979).

For the foregoing reasons, the judgment of the circuit court of

Lake County is reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

GEIGER, P.J., and DOYLE, J., concur.