2021 IL App (1st) 190589-U

SIXTH DIVISION
May 21, 2021

No. 1-19-0589

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20279 (01) |
| | ) | |
| MARLON BOYCE, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Defendant's conviction for first degree murder and 46-year sentence are affirmed: (1) a reasonable juror could have found the five eyewitness identifications of defendant as the driver of the car involved in a shooting sufficient; (2) the trial court's failure to fully sever defendant's trial from his codefendant's trial was not an abuse of discretion because their defenses were not antagonistic; (3) defendant's counsel was not ineffective for failing to impeach one of the witnesses; (4) because defendant cannot show he was prejudiced by the prosecutor's comments in closing, even if they were improper, trial counsel was not ineffective for failing to object to them and they do not rise to the level of plain error; and (5) defendant's sentence was not an abuse of discretion

¶ 2     Defendant Marlon Boyce was found guilty by a jury of first degree murder and was sentenced by the trial court to 46 years in prison. On appeal, Mr. Boyce argues that (1) the evidence

was insufficient to prove him guilty of first degree murder beyond a reasonable doubt, (2) the trial court erred by allowing Mr. Boyce's jury to hear his codefendant's cross-examinations of the State's witnesses, thereby not actually severing the trials, (3) Mr. Boyce's trial counsel was ineffective for failing to impeach a detective who testified for the State, (4) the State erred by referencing inadmissible evidence in closing argument, and (5) Mr. Boyce's *de facto* life sentence is excessive. For the following reasons, we affirm this conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4      Mr. Boyce and his codefendant Antoine Reynolds were charged with first degree murder based on the July 6, 2011, shooting death of Davonta Childress.

¶ 5      Before trial, Mr. Boyce moved to suppress statements he made to Detective Oscar Arteaga and both defendants filed motions to sever their trials. The trial court denied the motion to suppress, and the State did not object to the motion to sever, which the trial court granted.

¶ 6      Two separate juries were selected. After jury selection, but before trial began, the court asked why "severed crosses on every single witness" was necessary. Counsel for Mr. Boyce argued that there were antagonistic defenses because, on cross-examination for Mr. Reynolds, the witnesses would say that they had identified Mr. Boyce but not Mr. Reynolds. Counsel for Mr. Boyce expressed concern that "the constant emphasis" on the identification of Mr. Boyce would "sway the jury one way or the other." The trial court indicated that it did not intend to exclude the juries during cross-examinations because "[t]he mere fact that one eyewitness may identify one and not the other" did not require severed cross-examination. Although both juries heard the State's opening statement, Mr. Boyce's jury only heard a defense opening statement from his counsel. However, as explained below, both juries heard most of the cross-examinations.

¶ 7      The evidence presented at trial was that, at approximately 6:22 p.m. on July 6, 2011, a

group of people had congregated on the corner of 61st Street and Normal Boulevard in Chicago when a gold Cadillac pulled up alongside them and one or more individuals inside the vehicle began shooting at the group. Davonta Childress and Michael Barnes were both shot, and Mr. Childress died as a result. The State's theory at trial was that Mr. Boyce was the driver of the Cadillac and possibly fired a gun, and that Mr. Reynolds fired a gun from the back seat of the car.

¶ 8 The police investigated the shooting the night it occurred. That night, one witness—Michael Barnes—identified Mr. Boyce as the driver of the car, and the following day another witness—Terrell Barnes—also identified Mr. Boyce as the driver. No one identified the back-seat shooter at that time. The case was reopened two years later, and at that time, five eyewitnesses identified Mr. Boyce as the driver, while two eyewitnesses, Terry Butler and Calvin Garrett, identified Mr. Reynolds as the back-seat shooter. At trial, Mr. Butler and Mr. Garrett again identified Mr. Boyce as the driver of the Cadillac and Mr. Reynolds as the back-seat shooter. The three other witnesses, siblings Kenyatta Barnes, Michael Barnes, and Terrell Barnes, all of whom were teenagers at the time of the shooting, did not identify Mr. Boyce at trial. Kenyatta and Michael said at trial that they could recall neither the shooting nor their earlier cooperation with the police investigation. Terrell denied that he was even present on the day of the shooting, that he ever spoke with police, or that he identified Mr. Boyce as the driver. No physical evidence connecting Mr. Boyce to the shooting was recovered from the scene. The testimony from each witness as well as any other significant evidence that was introduced at trial is outlined below.

¶ 9 A. Terry Butler

¶ 10 Terry Butler, the State's primary identification witness, acknowledged that he was a convicted felon: he had prior convictions for possession of a fraudulent ID—a crime of dishonesty—as well as unlawful use of a weapon and aggravated unlawful use of a weapon.

¶ 11    Mr. Butler testified that, at approximately 6:22 p.m. on July 6, 2011, when it was still light outside, he was standing with a group of approximately 15 people who had congregated on the southeast corner of 61st Street and Normal Boulevard. The group included Davonta Childress, Michael Barnes, Terrell Barnes, and Kenyatta Barnes.

¶ 12    Mr. Butler saw Mr. Boyce driving a gold Cadillac south on Normal Boulevard, a two-way street. Mr. Butler explained that he had known Mr. Boyce "[a]ll [his] life" from around the neighborhood. Mr. Butler said that Mr. Boyce "swerved" onto their side of the street, into the northbound lane. Mr. Butler said he saw two people in the Cadillac—the driver and a passenger in the rear driver-side seat. Mr. Butler did not initially see anyone in the back, but then Mr. Butler saw a second man "lift up out of the back seat and start shooting." Mr. Butler identified the second man as "Antonio" Reynolds, who Mr. Butler had known, through Mr. Boyce, for approximately two years.

¶ 13    Mr. Butler testified that he saw Mr. Reynolds "raise up out of the back seat from the laying-down position" and begin shooting a large gun, like a "machine gun." When the shooting—which Mr. Butler described as 15 to 20 "[r]apid fire" shots—began, Mr. Butler turned around and started running, then fell and stayed on the ground. Mr. Butler said he also heard a different set of shots that sounded to him as though they were fired from a handgun but did not see who fired those shots.

¶ 14    Once the shooting stopped and Mr. Boyce drove away, Mr. Butler got off the ground and ran to the back of the building the group had been standing in front of, where he saw that Michael Barnes had been shot in the leg. Mr. Butler was not directly hit during the shooting, but did get hit with a bullet that had ricocheted off a building. Mr. Butler went to the hospital for treatment and spoke with police there briefly. Mr. Butler said he told the police he did not know what happened

or the names of anyone involved in the shooting. Mr. Butler explained at trial that this was because "[he] was scared." Mr. Butler claimed at trial that he was not under the influence of drugs or alcohol the night of the shooting.

¶ 15    Mr. Butler testified that, on July 29, 2014, more than three years later, he was being held in Cook County Jail on an unrelated felony gun charge when detectives came to see him and took him to the police station, where he had a conversation with Detective Arteaga. He was shown a photo array and identified Mr. Boyce as the driver of the Cadillac. Mr. Butler told the detective that he also knew who the back-seat shooter was and identified him as "Antonio." Mr. Butler confirmed that a photo of Mr. Reynolds depicted the person he knew as Antonio.

¶ 16    The following day, July 30, 2014, Mr. Butler testified before the grand jury. He again identified a photo of Mr. Boyce as the driver and identified a photo of Mr. Reynolds as the back-seat shooter. Mr. Butler also identified both men during the trial.

¶ 17    Mr. Butler acknowledged that after he cooperated with the police, he received the minimum sentence on the felony gun charge he was facing.

¶ 18                                  B. Calvin Garrett

¶ 19    Calvin Garrett, the only other witness who identified Mr. Boyce at trial, also acknowledged on the stand that he was a convicted felon with two prior felony convictions, both for reckless discharge of a firearm. At the time of trial, Mr. Garrett was also facing a charge of felony identity theft.

¶ 20    Mr. Garrett testified that he had known Mr. Childress for approximately two years from the neighborhood. On July 6, 2011, Mr. Garrett was driving his pickup truck when he saw Mr. Childress standing with a group at the intersection of 61st Street and Normal Boulevard. Mr. Childress stopped him to talk, and Mr. Garrett parked his truck on the opposite side of the street

from where the group was standing, staying in his truck. As Mr. Garrett and Mr. Childress were talking, a gold Cadillac, with a driver and one passenger in the back seat on the driver's side, pulled up between them.

¶ 21    Mr. Garrett testified that he could still see Mr. Childress and that he heard "[j]ust shots. A lot of, well, gunshots came from the back." Mr. Garrett saw the passenger in back shooting toward Mr. Childress and the other people on the corner with an assault rifle. Mr. Garrett saw Mr. Childress get struck with a bullet in the pelvic area, then fall. Although Mr. Garrett did not see anyone else in the Cadillac firing a weapon, he said "[i]t sounded like a second gun that went off" from the car.

¶ 22    Mr. Garrett said the shooting "was quick," lasting a "[c]ouple seconds." But before the Cadillac sped away, Mr. Garrett was able to see the driver and recognized him from the area as "Marlon." Mr. Garrett did not recognize the person in the back and had never seen that person before. After the Cadillac was gone, Mr. Garrett took Mr. Childress to the hospital.

¶ 23    Mr. Garrett testified that he met with two detectives at his home on July 8, 2011, and told them that he did not know who committed the shooting. Mr. Garrett explained that he did so "[b]ecause [he] was scared and [he] didn't want *** to have anything to do with it." When he spoke to the police again on January 27, 2014, at the police station, he told Detective Arteaga that he had been able to see the driver of the Cadillac and he identified a photo of Mr. Boyce from an array as the driver and a person he knew as "Marlon."

¶ 24    On January 30, 2014, Mr. Garrett testified before the grand jury and again identified Mr. Boyce from the photo array as the driver. He did not identify Mr. Reynolds at that time. He returned to the police station on October 3, 2014, where he identified Mr. Reynolds as the individual who was in the back seat, for the first time, from an in-person lineup. At trial, Mr. Garrett identified

both Mr. Reynolds and Mr. Boyce in open court.

¶ 25    Mr. Garrett said that when the shooting started, he ducked down inside his truck, leaned to the side "a little bit" and "laid *** across the seat." Mr. Garrett only saw Mr. Boyce driving; he did not see Mr. Boyce shooting or holding a gun. And, although he heard a second gun being fired from the car, he never saw a second gun. Mr. Garrett said he just knew Mr. Boyce "from around the area," and knew him as "Marlon."

¶ 26                              C. Kenyatta and Michael Barnes

¶ 27    Both Kenyatta and Michael Barnes testified at trial. They had previously identified Mr. Boyce in interviews with the police and before the grand jury. Michael identified Mr. Barnes the night of the shooting, but Kenyatta did not identify him until the case was reopened in 2014. At trial, however, they both mostly said, "I don't remember," in response to each question asked about the night of the shooting, their subsequent interviews with police, and their testimony before the grand jury. Their grand jury testimony was admitted as substantive evidence and the photo arrays they marked with their signatures identifying Mr. Boyce were shown to the jury.

¶ 28    In their grand jury testimony, both Kenyatta and Michael said that they were part of the group hanging out on the corner of 61st Street and Normal Boulevard at approximately 6:20 p.m. on July 6, 2011, and both were friends with Mr. Childress. They both testified they saw a car, which Kenyatta was able to identify as a gold Cadillac, pull up close to the stop sign and stop in the middle of the intersection. Michael and Kenyatta both testified that the stopped car made them nervous. They both testified that they saw three people in the car and that both the driver and the rear driver-side passenger started shooting at the group on the corner. They both got a good look at the driver but not at the rear passenger. According to Michael, the driver was firing a handgun while the rear passenger was firing what looked like a machine gun.

¶ 29     Before the grand jury, Kenyatta identified the photo array in which she had identified Mr. Boyce as "[t]he shooter" to Detective Arteaga, and a photo of Mr. Boyce alone as "the driver." Michael also identified the photo array in which he had identified Mr. Boyce to Detective Arteaga and an individual picture of Mr. Boyce as "[t]he driver."

¶ 30                                       D. Terrell Barnes

¶ 31     Terrell Barnes testified only before Mr. Boyce's jury, and his trial testimony largely consisted of him recanting his prior statements identifying Mr. Boyce as the driver. He also acknowledged that he had been previously convicted for aggravated unlawful use of a weapon in 2013 and 2015, and at the time of trial he was facing an armed habitual criminal charge.

¶ 32     On cross-examination, Terrell said that when he testified before the grand jury, an assistant state's attorney and "some other men" said they would let Terrell go if he told them what they wanted to know, so he testified as they asked him to, but what he said was not true. His trial testimony was that he had lied when he told the grand jury he saw both the driver and the passenger shooting. Terrell testified at trial that the photo of Mr. Boyce "[wa]s not the person that was the driver of a car who did a drive-by shooting on July 6, 2011" at 61st Street and Normal Boulevard, and that his previous statements about the person in the photo being the shooter were "not true." Terrell then said he did not know whether it was Mr. Boyce pictured in the photo and that he did not see the person in the photo in court.

¶ 33     The transcript of Terrell's grand jury testimony was admitted as substantive evidence. Terrell testified before the grand jury that, at the time, he was facing a charge for unlawful use of a weapon. Terrell said he ran into Mr. Childress, his best friend, at approximately 3:45 p.m. on July 6, 2011, and they talked until several other people joined them, including Terrell's siblings. Terrell saw the gold Cadillac stop in the middle of the intersection, which made him nervous, so

he retreated to the porch at 6101 South Normal Boulevard to watch. Terrell saw a person sit up in the back seat, then that person and the driver started shooting. The driver had a black handgun, and the back-seat passenger had a black assault rifle. Terrell said he got a good look at both shooters because they were facing him. There was also a passenger in the front seat, but Terrell did not see his face. The shooting continued as they drove south directly passed Terrell. He got a good look at the driver then, but not at the passenger. In Terrell's grand jury testimony, he identified a photo array he had been shown at the police station in which he had identified Mr. Boyce as the driver of the gold Cadillac and as a shooter to Detective Arteaga, and an individual picture of Mr. Boyce who he again identified as the driver and a shooter.

¶ 34    Detective Medina testified that she spoke with Terrell on July 7, 2011, and Terrell said he recognized the driver as a person named "Marlon." Detective Medina said she met with Terrell again the following day, on July 8, and Terrell signed a photo array/lineup advisory form. Terrell then viewed a lineup, from which he identified Mr. Boyce as the driver of the Cadillac.

¶ 35                    E. Cross-Examinations by Counsel for Mr. Reynolds

¶ 36    Mr. Boyce's counsel renewed his objection to the Boyce jury's presence during cross-examination by counsel for Mr. Reynolds. The court repeatedly denied the objection because it did not believe the defenses were antagonistic. As relevant to this appeal, the following occurred during these cross-examinations.

¶ 37    When counsel for Mr. Reynolds questioned Mr. Garrett, who had identified Mr. Boyce in a photo array in 2014, he referred twice to the photo array "with Mr. Boyce in it," emphasizing that Mr. Garrett was never shown a photo array that included Mr. Reynolds. When he questioned Kenyatta and Michael, who recanted their identifications of Mr. Boyce at trial, he emphasized that they had signed photo arrays identifying Mr. Boyce previously, although they had never identified

his client.

¶ 38    When counsel for Mr. Reynolds questioned Detective Arteaga, he asked: "Now the first thing Mr. Butler told you is he knew who the driver of the vehicle was that was involved in this homicide, correct," to which Detective Arteaga responded, "Correct, sir." Detective Arteaga agreed that Mr. Butler knew the driver's name, which was "Marlon Boyce." Detective Arteaga agreed that, before he looked at the photo array, Mr. Butler said he had known Mr. Boyce for a while and was familiar with him. Counsel then asked, "So even though Terry Butler told you he knew Marlon Boyce and had prior familiarity with Marlon Boyce, you decided to show Terry Butler a photo spread, correct?" to which the detective said, "Yes, sir. He knew Marlon Boyce was an individual named in the shooting as an offender." Counsel asked the detective if Mr. Reynolds was part of the photo array showed to Mr. Butler, and Detective Arteaga said he was not. Counsel then asked the detective if Mr. Butler "made an identification of Mr. Boyce as the front seat shooter," if he had asked Mr. Butler to "sign and date or initial the photograph identifying Mr. Boyce," and whether Mr. Butler "signed and dated his name next to the picture of Marlon Boyce from that array." Detective Arteaga responded in the affirmative to all three questions.

¶ 39    Detective Arteaga also agreed that it was only after he asked whether Mr. Butler had any other information about the shooting that Mr. Butler said he knew who the back-seat shooter was, and when the detective showed Mr. Butler the single photo of Mr. Reynolds, he did not have Mr. Butler sign and date that photo.

¶ 40                                  F. Other Evidence

¶ 41    Officer Barry Earls, an evidence technician with the Chicago Police Department, testified that he recovered 12 cartridge cases from the area of the shooting at approximately 7:15 p.m. that same evening. He explained that while a semiautomatic firearm would dispel cartridge cases as it

was being fired, a revolver would not.

¶ 42 Detective Arteaga also testified, in front of Mr. Boyce's jury only, that he had a conversation with Mr. Boyce in Kenosha, Wisconsin, on October 20, 2014, and Mr. Boyce indicated that in July 2011 he drove a "gold Cadillac."

¶ 43 The parties stipulated that the postmortem examination of Mr. Childress concluded that Mr. Childress's death was caused by multiple gunshot wounds, with the manner of death being homicide. The parties also stipulated that the doctor who treated Mr. Butler at the hospital on July 6, 2011, ordered a toxicology report as part of the treatment, and the test results showed the presence of both alcohol and cannabinoids in Mr. Butler's system.

¶ 44 G. The Defense's Case

¶ 45 After the State rested, Mr. Boyce's counsel moved for a directed verdict, which the trial court denied. The defense presented two witnesses, Chicago police officer Thomas Erlich and Detective Joseph Aguirre. Officer Erlich testified that he spoke to Michael Barnes at the scene of the shooting, but said he could only get a sentence or two out of Michael. In his report, Officer Erlich recorded Michael's response to questions about the suspect as "unknown" and noted that Michael referred to someone inside the vehicle as an "occupant." Detective Joseph Aguirre testified he interviewed Mr. Garrett on July 9, 2011, and, Mr. Garrett said that he could not identify anyone involved in the shooting, but said that the two offenders were wearing white t-shirts, and he saw a handgun come out of the window of a gold-colored Cadillac. Detective Aguirre said he did not show Mr. Garrett a photo array because Mr. Garrett said he did not see who did the shooting.

¶ 46 H. Jury Verdict, Posttrial Matters, and Sentencing

¶ 47 The jury found Mr. Boyce guilty of first degree murder and found that the State proved he

was armed with a firearm. Mr. Boyce's counsel moved for a new trial, arguing that the court erred in allowing counsel for Mr. Reynolds to cross-examine the State's witnesses in the presence of Mr. Boyce's jury. The trial court denied the motion.

¶ 48    After hearing argument in aggravation and mitigation, and Mr. Boyce's statement in allocution, the trial court issued its sentence. The judge made clear he had reviewed both the presentence investigation reports for both defendants and the sentencing statute and had "contemplated what [he] believe[d] to be a fair sentence." The judge noted that both defendants were relatively young at the time of the crime—Mr. Boyce was 23 and Mr. Reynolds was 24—but found that many of the factors considered in juvenile sentencing did not apply, "particularly" in light of the fact that both defendants had been in the adult criminal system "several times." The judge discussed the facts of the crime, noting that it was a "very violent" and "preplanned attack," and that both defendants fired into a crowd. The judge said he considered the factors in mitigation, finding many of them inapplicable due to the seriousness of the offense. The judge then said he considered statutory and non-statutory factors in aggravation, finding that many of them applied and specifically noting a few of them, including that the defendants' "conduct caused and threatened serious injury." The judge discussed both defendants' criminal history. The judge stated the sentencing range and discussed at length "the four factors in sentencing: Rehabilitation, incapacitation, punishment and deterrence." The judge said: "I often struggle with *** how I can craft a rehabilitative sentence when someone is convicted of first degree murder such as in this circumstance when somebody has to get at least 35 years in the penitentiary. But I do take that factor into consideration." The court sentenced Mr. Boyce to 46 years in prison—31 years for the murder plus the 15-year firearm enhancement, and sentenced Mr. Reynolds to a total of 50 years in prison. The court denied counsel's motion to reconsider Mr. Boyce's sentence.

¶ 49    This appeal followed.

¶ 50                              II. JURISDICTION

¶ 51    Mr. Boyce was sentenced on February 28, 2019, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 52                              III. ANALYSIS

¶ 53    On appeal, Mr. Boyce argues that (1) the evidence was insufficient to prove him guilty of first degree murder beyond a reasonable doubt, (2) the trial court erred by allowing Mr. Boyce's jury to hear Mr. Reynolds's cross-examinations of the State's witnesses, thereby not actually severing the trials, (3) Mr. Boyce's trial counsel was ineffective for failing to substantively impeach Detective Arteaga, (4) the State erred by referencing inadmissible evidence in closing argument, and (5) Mr. Boyce's *de facto* life sentence is excessive. We consider each issue in turn.

¶ 54                         A. The Evidence Was Sufficient

¶ 55    Mr. Boyce first argues that the evidence was insufficient to prove him guilty of first degree murder. The jury in this case was instructed that it could find Mr. Boyce guilty on a theory of accountability, regardless of whether he actually fired the shots that killed Mr. Childress. 720 ILCS 5/5-2(c), 9-1(a)(1) (West 2011). Mr. Boyce does not contest this point. Rather, he argues that the identifications of him as the driver for this shooting were so inconsistent, unreliable, and unbuttressed by physical evidence, that they cannot be the basis for sustaining this conviction.

¶ 56    "When considering a challenge to a criminal conviction based on the sufficiency of the evidence," we do not retry the defendant. (Internal quotation marks omitted.) *People v. Swenson*, 2020 IL 124688, ¶ 35. Instead, we must determine " 'whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact," and "we will not substitute our judgment for the trier of fact." *Id.* "We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 57    Looking at the evidence as a whole and viewing it in the light most favorable to the State, we cannot say that no reasonable juror could have found Mr. Boyce guilty beyond a reasonable doubt of first degree murder, either directly or by accountability for the shooter's actions. Five witnesses identified Mr. Boyce as the driver of the Cadillac at various times between the time of the shooting and trial. Mr. Butler and Mr. Garrett identified Mr. Boyce at trial, and previously identified him in a 2014 photo array and before the grand jury in 2014. Although they did not identify Mr. Boyce until almost two years after the shooting, their testimony was supported by the prior testimony and statements of the Barnes siblings. According to Detective Medina, Terrell Barnes named the driver as "Marlon" the day after the shooting and identified Mr. Boyce in a photo array two days after the shooting. Michael Barnes also identified Mr. Boyce as the driver and as a shooter two days after the shooting. Detective Arteaga testified that the Barnes siblings all identified Mr. Boyce as the driver and as a shooter when he interviewed them in December 2013. The Barnes siblings likewise testified under oath before the grand jury that Mr. Boyce was the driver and a shooter.

¶ 58    Mr. Boyce insists that this evidence was insufficient because (1) the eyewitnesses gave contradictory statements about Mr. Boyce's involvement in the offense, (2) their identifications of him were unreliable, and (3) there was no physical evidence linking him to the offense. We are unpersuaded by each of these arguments.

¶ 59                              1. Inconsistent statements

¶ 60    Mr. Boyce argues that each of the five witnesses who identified him gave a number of contradictory statements, sometimes identifying him as the driver, sometimes identifying him as the driver and as a shooter, and sometimes not identifying him at all. Mr. Boyce argues that these inconsistencies completely destroy any credibility that could be given to their identifications of him. We disagree.

¶ 61    Mr. Butler and Mr. Garrett both testified at trial that they told the police at the time of the shooting they could not identify anyone, explaining their initial refusal to come forward sooner by saying that they had been "scared" to get involved. Beginning with their photo array identifications of Mr. Boyce in 2014, Mr. Butler and Mr. Garrett consistently identified Mr. Boyce as the driver of the Cadillac. They also both knew Mr. Boyce. "The persuasiveness of identification testimony is strengthened by the witness's prior acquaintance with the accused." *People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006). The consistency of these witnesses' identifications since 2014, their prior knowledge of Mr. Boyce, and their explanations for their initial refusal to make an identification all make it reasonable for a juror to have relied on their trial testimony.

¶ 62    The Barnes siblings provided no identifications at trial. Michael and Kenyatta claimed to not remember anything related to the shooting or the investigation, and Terrell denied even being present for the shooting or having any involvement in the investigation. However, almost immediately after the shooting, both Terrell and Michael identified Mr. Boyce in a photo array.

And all three Barnes siblings testified under oath before the grand jury that they saw Mr. Boyce driving the car and firing a weapon. This was a classic case of using grand jury testimony as substantive evidence in order to prevent "a turncoat witness from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." (Internal quotation marks omitted.) *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 61. The jury was also entitled to rely on this previous testimony.

¶ 63    *People v. Herman*, 407 Ill. App. 3d 688 (2011), and *People v. Brown*, 303 Ill. App. 3d 949 (1999), relied on by Mr. Boyce, are very different. In *Herman*, the State's case rested on the credibility of a single witness, an admitted drug addict, whose testimony the court found was "fraught with inconsistencies and contradictions," and in some places contradicted by other witnesses. 407 Ill. App. 3d at 705-07. In *Brown*, "the *only* evidence linking [the] defendant to the victim's murder [wa]s a disavowed witness statement." (Emphasis added.) 303 Ill. App. 3d at 964-66. In contrast, here two witnesses—Mr. Butler and Mr. Garrett—identified Mr. Boyce at trial, and two other witnesses—Michael and Terrell—identified Mr. Boyce two days after the shooting and testified to this under oath before the grand jury.

¶ 64                        2. The reliability of the witness identifications

¶ 65    Mr. Boyce also argues that all of the witness identifications of him were unreliable under the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). Again, we disagree.

¶ 66    The *Biggers* factors are:

"(1) the opportunity the [witness] had to view the criminal at the time of the crime; (2) the [witness]'s degree of attention; (3) the accuracy of the witness'[s] prior description of the criminal; (4) the level of certainty demonstrated by the [witness] at the identification

- 16 -

confrontation; and (5) the length of time between the crime and the identification confrontation." *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989).

We consider these factors under a totality of the circumstances approach, with no one factor determining whether an identification is reliable. *People v. Romero*, 384 Ill. App. 3d 125, 132 (2008).

¶ 67    The first factor, the witness's opportunity to view the offender at the time of the crime, is the "most important" factor. *People v. Wehrwein*, 190 Ill. App. 3d 35, 39 (1989). And, in this case, this factor weighs heavily in favor of the State. The shooting occurred at approximately 6:22 p.m. on July 6, 2011, while it was still light out. Mr. Butler, Mr. Childress, and the Barnes siblings were standing on the southeast corner of the intersection. Mr. Garrett was parked across the street from the group, yet close enough to be talking to Mr. Childress. While the Cadillac was stopped only briefly, the testimony was consistent that the witnesses were able to get a good look at the driver.

¶ 68    The degree of attention by the witnesses also weighs in the State's favor. All five witnesses provided a fair amount of detail as to what they observed. They all provided detailed accounts of the gold Cadillac's movements and the movements of its occupants. For example, Mr. Butler and Terrell both testified that they saw the back seat passenger rise up from a prone position, and Mr. Garrett saw Mr. Childress get shot while Terrell saw Mr. Childress fall and hit his head.

¶ 69    The next factor—the accuracy of the witnesses' prior descriptions of the offender—is the only factor that weighs entirely in favor of Mr. Boyce. Beyond Mr. Garrett's very general description of two unknown individuals wearing white t-shirts, none of the witnesses provided a prior description of the Cadillac's occupants. See *In re O.F.*, 2020 IL App (1st) 190662, ¶ 49 (where the witness provided no description of the offender, "we [we]re unable to compare for accuracy the description on which [the offender]'s arrest was based, further weakening the

identification."). However, Mr. Boyce's counsel emphasized this fact and the lack of descriptions through both cross-examination and closing argument, so the jury was well aware of this weakness in the identifications. Moreover, the fact that the witnesses knew Mr. Boyce minimizes the significance of this factor.

¶ 70    The fourth factor, the degree of certainty with which the identifications were made, again weighs in favor of the State. Mr. Butler and Mr. Garrett both knew Mr. Boyce, and both positively identified him as the driver of the Cadillac in a photo array, before the grand jury, and at trial. Terrell was also familiar with Mr. Boyce, as he identified the driver as "Marlon" the day after the shooting and then the next day identified Mr. Boyce in a photo array. Michael also identified Mr. Boyce two days after the shooting in a photo array. And both Terrell and Michael consistently identified Mr. Boyce again for Detective Arteaga in a photo array and before the grand jury. Kenyatta was arguably the least certain, as she did not initially identify Mr. Boyce in the photo array two days after the shooting, but she did identify him for Detective Arteaga in a photo array and before the grand jury in 2013. Considered together, we cannot say that any identification was so uncertain that this factor should weigh in favor of Mr. Boyce.

¶ 71    As to the final factor—the time between the occurrence of the crime and the identifications—while it weighs in favor of Mr. Boyce as to Mr. Butler, Mr. Garrett, and Kenyatta, who did not identify Mr. Boyce for well over two years, it weighs in favor of the State as to Michael and Terrell, who both identified Mr. Boyce in a photo array two days after the shooting. And Mr. Butler and Mr. Garrett both knew Mr. Boyce, which strengthens their identification testimony, despite the passage of time. *Barnes*, 364 Ill. App. 3d at 895. Moreover, the passage of time, though certainly relevant, "goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (upholding an

identification where more than two years had lapsed since the time of the offense).

¶ 72                    3. Witness credibility and the lack of physical evidence

¶ 73    Mr. Boyce makes a number of additional arguments for why each of the five witnesses lacked credibility as a general matter. He points out that Mr. Butler, Mr. Garrett, and Terrell were convicted felons who may have been motivated to lie in order to curry favor with the State. It is true that when Mr. Butler first identified Mr. Boyce, he was facing a pending felony charge and eventually received the minimum sentence; Mr. Garrett was facing an identity theft charge at the time of Mr. Boyce's trial; and Terrell was in jail when he identified Mr. Boyce, when he testified before the grand jury in 2013, and when he testified at trial. These circumstances are correctly viewed as evidence of potential bias, interest, or motive to testify falsely. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 98. Michael and Kenyatta also had memory problems, and Terrell recanted his identification, going so far as to sign a statement that his prior identifications of Mr. Boyce were "not true." Mr. Boyce also emphasizes the lack of physical evidence to corroborate the witnesses' identifications of him.

¶ 74    It is well-settled, however, that the credible and positive testimony of a single eyewitness is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In this case, the State presented five witnesses who, despite being imperfect witnesses in different ways, were all reasonably credible when they identified Mr. Boyce.

¶ 75    Having considered the weaknesses pointed out by Mr. Boyce, when we look at the totality of the evidence presented, in the light most favorable to the State, we certainly cannot say that the jury's verdict, based on these identifications, was so arbitrary or fanciful that no reasonable juror could have reached the same conclusion.

¶ 76     B. The Trial Court's Failure to Fully Sever the Trials was Not an Abuse of Discretion

¶ 77     Mr. Boyce next argues that the trial court erred in conducting simultaneous trials that did not really sever the defendants' cases, since Mr. Boyce's jury heard cross-examination by Mr. Reynold's counsel. We review this issue for an abuse of discretion. *People v. Daugherty*, 102 Ill. 2d 533, 541 (1984). A trial court abuses its discretion where "its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004).

¶ 78     Mr. Boyce argues it was an abuse of discretion to not fully sever the two trials because he and Mr. Reynolds had antagonistic defenses. According to Mr. Boyce, the State's evidence was improperly reinforced when Mr. Boyce's jury heard counsel for Mr. Reynolds cross-examine the State's witnesses. The State responds that Mr. Reynolds's defense was not antagonistic or hostile to Mr. Boyce, and therefore the trial court's decision not to completely sever the trials was not an abuse of discretion.

¶ 79     "The long-established rule in [Illinois] is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." (Internal quotation marks omitted.) *People v. Byron*, 116 Ill. 2d 81, 92 (1987). Our supreme court has recognized two specific types of prejudice requiring separate trials: (1) where one codefendant implicates the other (*People v. Bean*, 109 Ill. 2d 80, 93 (1985)), and (2) when the codefendants' defenses are so antagonistic to each other that one cannot receive a fair trial jointly with the other (*Daugherty*, 102 Ill. 2d at 542).

¶ 80     Although the trial court granted the defense's motion for severance and separated the juries for each defendant's opening statement and closing argument, it also permitted both juries to remain while Mr. Reynolds's counsel cross-examined most of the State's witnesses. We agree with

Mr. Boyce that these trials were not actually severed. Compare *People v. Rodriguez*, 289 Ill. App. 3d 223, 237 (1997) (noting that the trial court likely recognized there were antagonistic defenses because it granted the motion to sever, but then "seemingly disregarded its original concern by allowing [the codefendant] to conduct his cross-examination in the presence of [the] defendant's jury") and *People v. Johnson*, 149 Ill. 2d 118, 133 (1992) (where the court held simultaneous severed jury trials but "cross-examination of the State's witnesses by either defendant was done only within the presence of that defendant's jury"). Accordingly, we agree with Mr. Boyce—and indeed the State seems to concede this—that we must analyze this issue as though the motion to sever was not granted.

¶ 81 Mr. Boyce argues that severance was required because Mr. Reynolds's defense was antagonistic to his. The "classic example" of antagonistic defenses occurs where "each defendant was protesting his innocence and condemning the other" such that "an actual and substantial hostility existed between the defendants over their lines of defense." *Daugherty*, 102 Ill. 2d at 542 (citing *People v. Braune*, 363 Ill. 551 (1936)). What is required is "a showing of true conflict" in the defenses (*People v. Precup*, 50 Ill. App. 3d 23, 29 (1977), *aff'd*, 73 Ill. 2d 7 (1978)), "where the trial becomes more of a contest between codefendants than between the State and defendants" (*People v. Mercado*, 397 Ill. App. 3d 622, 628 (2009)).

¶ 82 In this case, the defenses were not antagonistic in the sense that severed trials were required. Counsel for Mr. Boyce and counsel for Mr. Reynolds both focused on the weaknesses of the witness identifications of their respective clients. In doing so, counsel for Mr. Reynolds pointed out the relative strength of the witnesses' identifications of Mr. Boyce and the better police procedures that were used to obtain those identifications. For example, counsel for Mr. Reynolds pointed out that Mr. Boyce was identified from a photo array, whereas Mr. Reynolds was identified

from a single photo, and that Mr. Boyce was identified soon after the murder, whereas Mr. Reynolds was not identified until years later. At the same time, Mr. Reynolds's cross-examinations sometimes *helped* Mr. Boyce's cause, focusing on circumstances that called into question the reliability of the identifications for both defendants, including the fact that neither Mr. Butler nor Mr. Garrett made any identification on the night of the shooting, the less-than-ideal circumstances from which both Mr. Butler and Mr. Garrett viewed the shooting, and that Mr. Butler said he did not have alcohol or cannabis in his system when, in fact, he did.

¶ 83   This case was not a contest between Mr. Boyce and Mr. Reynolds. Rather, Mr. Boyce and Mr. Reynolds were both attempting to undermine the State's identification evidence. The jury could have acquitted both of them, had they accepted their defenses. These defenses were not so inconsistent that we can view the trial court's decision to not fully sever these trials as an abuse of discretion.

¶ 84   In *Rodriguez*, the case Mr. Boyce relies on, multiple witnesses had initially told the police the codefendant was the shooter, but at trial they testified that their prior statements had been coerced and that the defendant was actually the shooter. *Rodriguez*, 289 Ill. App. 3d at 227-30. On appeal, the court found that, "by arguing on cross-examination that the witnesses were telling the truth at trial, [the codefendant] was presenting evidence to [the] defendant's jury that [the] defendant was the shooter." *Id.* at 236. In addition, the court noted that the codefendant's "cross-examinations did nothing but reinforce the State's direct examinations." Here, in contrast, an argument by Mr. Reynolds that the identifications of him were less reliable than those of Mr. Boyce did not point the finger at Mr. Boyce. The defenses in this case were simply not antagonistic in the same way as the defenses in *Rodriguez* were because neither defendant was protesting his innocence at the expense of the other.

¶ 85    Because we find that the defenses of Mr. Boyce and Mr. Reynolds were not antagonistic, the trial court did not abuse its discretion by not fully severing the trials.

¶ 86                                C. Trial Counsel Was Not Ineffective

¶ 87    Mr. Boyce argues that his trial counsel was ineffective for failing to substantively impeach Detective Arteaga. To succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel performed deficiently and (2) he was prejudiced by that deficient performance. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim." *Id.* "To satisfy the first prong, a defendant must overcome the presumption that contested conduct which might be considered trial strategy is generally immune from claims of ineffective assistance of counsel." *Id.* "To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different." *Id.*

¶ 88    Mr. Boyce argues that counsel's performance was deficient because counsel failed to impeach Detective Arteaga's testimony that Mr. Boyce told the detective that he drove a "gold" Cadillac in July 2011. Mr. Boyce argues that his counsel could have impeached this statement with either the transcript of the pretrial hearing on the motion to suppress, where Detective Arteaga testified that Mr. Boyce indicated he drove a "brown" Cadillac, or with the recording of the conversation, in which Mr. Boyce did not identify the color of the car at all.

¶ 89    We consider the totality of counsel's performance, not just isolated incidents, in determining whether counsel was deficient. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). "In considering whether counsel's performance was deficient, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance.' " *People v. Patterson*, 217 Ill. 2d 407, 441 (2005) (quoting *Strickland*, 466 U.S. at 689). "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Id.* at 326-27. Accordingly, for a defendant to show that his counsel was deficient on this basis, he or she must show "counsel's approach to cross-examination was objectively unreasonable." *Id.* at 327.

¶ 90    Mr. Boyce's counsel vigorously cross-examined Detective Arteaga with respect to proper police procedure and Kenyatta's failure to identify Mr. Boyce in a lineup two days after the shooting. Counsel also clarified that "[Mr. Boyce] never told you he drove a gold Cadillac on July 6th of 2011, did he?" to which Detective Arteaga answered, "[n]o, sir."

¶ 91    As the State notes, the recording of the conversation between Detective Arteaga and Mr. Boyce would not necessarily have been directly impeaching. The recorded conversation was circuitous and although Mr. Boyce never quite confirmed the color of the car, he did admit he had a Cadillac. The detective's testimony at the suppression hearing was likewise that Mr. Boyce had said he had a Cadillac—albeit at brown one.

¶ 92    To the extent that either of these statements was impeaching, there were strategic reasons not to use them. At the time Detective Arteaga recorded the conversation with Mr. Boyce, Mr. Boyce was in custody in Kenosha on an unrelated charge, a fact that was not elicited at trial. If counsel had introduced the recording, Mr. Boyce's custody in Wisconsin could have been obvious, a reasonable image for counsel to avoid. And if counsel had used the testimony from the motion to suppress, this would have confirmed and underscored the detective's testimony about Mr.

Boyce's ownership of a Cadillac. All considered, we cannot say that trial counsel's failure to impeach Detective Arteaga on this point was deficient.

¶ 93            D. The Prosecutor's Comments in Closing Were Not Plain Error or

Prejudicial Under *Strickland*

¶ 94    Mr. Boyce next argues that the prosecutor relied on inadmissible evidence during closing argument, and because the error was a material factor in his conviction, this case should be remanded for a new trial. Prosecutors are generally given wide latitude in closing argument. *People v. Jackson*, 2020 IL 124112, ¶ 82. "They may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant." *Id.* On review, we look at the closing argument as a whole, rather than only looking at selected remarks. *Id.*

¶ 95    The comments Mr. Boyce takes issue with are as follows, describing Detective Arteaga's conversation with Kenyatta:

> "She said she's scared. She said she didn't want to be involved. But you know what, she showed courage. She said you know what, I will tell you what I saw. She cooperated and she talked to Detective Arteaga. And Detective Arteaga said can I show you a photo array. Would you be willing to look at it. She said yes. She looked at that and she said despite the fact she was scared before, she recognized the driver *** and she identified this man. Just like her two brothers, they *** all saw this man Marlon."

¶ 96    The State argues and Mr. Boyce concedes that he has forfeited this issue because counsel did not object to the complained-of statements during closing argument and did not raise the issue in his posttrial motion. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) ("to preserve a claim of error for review, counsel must object to the error at trial and raise the error in a motion for a

new trial before the trial court."). Mr. Boyce asks that we review this either as ineffective assistance by his counsel or under plain error. As noted above, to succeed on a claim of ineffective assistance of counsel, a defendant must show that he was prejudiced by his counsel's deficient performance. *Banks*, 2016 IL App (1st) 131009, ¶ 123. Similarly, plain error requires a showing that the defendant suffered prejudice. *People v. White*, 2011 IL 109689, ¶ 133.

¶ 97 Mr. Boyce cannot succeed on this claim because, even if we assume that the prosecutor's argument was improper because Kenyatta's out of court statements were not admitted as substantive evidence, we cannot say that an objection—even if it had been sustained—would have likely changed the outcome of the trial. Five witnesses identified Mr. Boyce as the driver and he admitted to having a Cadillac, which was the car that was identified as the drive-by vehicle. Despite the imperfections of each identification, taken together, the evidence that Mr. Boyce was the driver was strong. Moreover, this comment was one among over 20 pages of closing and rebuttal argument, and the court instructed the jury that closing arguments are not evidence, reducing the possibility of prejudice. *Green*, 2017 IL App (1st) 152513, ¶ 98.

¶ 98 The case that Mr. Boyce relies on, *People v. Boling*, 2014 IL App (4th) 120634, ¶ 131, is different. The evidence in that case was closely balanced, with the State's case consisting "almost entirely of [the victim]'s statements" and with the defendant "outright den[ying]" the victim's accusations at trial. The court found plain error because "the erroneous admission of prejudicial evidence and the State's improper argument based thereon, threatened to tip the scales of justice against defendant." *Id.* at 144. That is simply not true in Mr. Boyce's case.

¶ 99                    E. Mr. Boyce's Sentence Was Not Excessive

¶ 100 Finally, Mr. Boyce argues that his sentence of 46 years in prison was excessive because of his rehabilitative potential and the fact that he was not the principal offender.

¶ 101   Illinois Supreme Court Rule 615(b)(4) allows a reviewing court to reduce a sentence. Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). However, this power "should be exercised cautiously and sparingly." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court." *Id.* A sentence is considered an abuse of discretion when it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.* A sentence promotes the spirit and purpose of the law when it reflects the seriousness of the offense and adequately considers the defendant's rehabilitative potential. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 102   A sentence is presumed to be proper if it is within the applicable statutory range. *Id.* Mr. Boyce faced a sentencing range of 35 to 75 years in prison. This included 20 to 60 years for first degree murder (730 ILCS 5/5-4.5-20(a)(1) (West 2010)), plus a 15-year sentencing enhancement for being armed with a firearm during the commission of the crime (*id.* § 5-8-1(d)(1)).

¶ 103   The transcript of the trial judge's ruling at the sentencing hearing is over 12 pages long. The judge appears to have carefully considered the facts of the crime, Mr. Boyce's presentence investigation report, the factors in aggravation and mitigation, and Mr. Boyce's potential for rehabilitation. Although 46 years is a lengthy sentence, it is at the lower end of the range that Mr. Boyce was facing.

¶ 104   Mr. Boyce argues that 46 years is a *de facto* life sentence, because he must serve 100% of the sentence (730 ILCS 5/3-6-3(a)(2)(i) (West 2010)), and will therefore not be released until he is 73 years old, exceeding his life expectancy. See *People v. Reyes*, 2016 IL 119271, ¶ 9 ("A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a *** defendant's life as would an actual mandatory sentence of life without parole—in

either situation, the [defendant] will die in prison."). He also argues that his sentence does not account for "the degree of harm the State proved he caused"—because he was found guilty on a theory of accountability—or his rehabilitative potential. But "[a] sentencing court is not required to give greater weight to [a] defendant's rehabilitative potential than to the seriousness of the crime" and, "[i]n fact, the seriousness of an offense is considered the most important factor in determining a sentence." *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53. "[T]he reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors different." *Alexander*, 239 Ill. 2d at 213. Here, Mr. Boyce is asking us to do just that—reweigh the factors—something we simply cannot do.

¶ 105                                IV. CONCLUSION

¶ 106    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 107    Affirmed.