2025 IL App (1st) 231726-U

No. 1-23-1726

SECOND DIVISION
November 4, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 14180 |
| | ) | |
| PATRICK CALVIN, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred with the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence are affirmed where the trial court did not err in removing the jury during the cross-examination of eyewitnesses by codefendants, the State did not elicit other crimes evidence that was prejudicial to defendant, the photo arrays used to identify defendant were not unduly suggestive, the prosecutor's comments during closing argument were proper, and defendant's sentence was not excessive.

¶ 2    Defendant Patrick Calvin and his codefendants, Garrett Glover and Tyrone Mixon, were tried simultaneously for the murder of Larry Porter. Defendant chose a jury trial, and the trial court granted his motion to sever his trial from the bench trials of his codefendants. The jury found

defendant guilty of first degree murder, and he now appeals his conviction and sentence of 50 years' imprisonment. On appeal, defendant contends he was denied a fair trial where 1) the trial court removed his jury from the courtroom for his codefendants' cross-examination of two eyewitnesses, 2) the State elicited prejudicial other crimes evidence without a corresponding limiting instruction, 3) the trial court denied his motion to suppress identification of him based on an unduly suggestive photo array, and 4) the prosecutor made improper comments that overstated, or were not based on, the evidence. Defendant also contends that his sentence was excessive where the trial court did not sufficiently consider the mitigating factors set forth in *Miller v. Alabama*, 567 U.S. 460 (2012), including his age, mental health issues, or rehabilitative potential. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                   A. *Pretrial Motions*

¶ 5                                1. Motion for Severance

¶ 6      Defendant filed a motion to sever his jury trial from his codefendants' trials. Therein, defendant alleged that each was charged with first degree murder, and codefendant Glover made statements to the police and a third party that incriminated defendant. Defendant also alleged that the State would use those statements against him and that Glover would not testify at trial. He thus sought a severed trial pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). The trial court granted the motion.

¶ 7                          2. Motion to Suppress Identification

¶ 8      Defendant also filed a motion to suppress identification testimony based on an unduly suggestive photo array.

¶ 9      At the hearing on the motion, the parties stipulated that if called to testify, Officer Freddy Summers would state that he was assigned to investigate the shooting death of Porter that occurred on September 5, 2012. On September 6, 2012, Summers interviewed Shamaree Siller. Siller stated that he was with Porter in a vehicle on the night of the incident. Porter was driving in the right lane when Siller heard gun shots "and got down." After their vehicle crashed, Siller heard 8 to 10 more shots. He did not give a description of the shooters.

¶ 10     Summers interviewed Siller again on September 26, 2012. Siller stated that on the night of the shooting, they were driving southbound on Interstate 94 when a maroon van pulled up next to them. The van's passenger side door opened and he "observed three black males all crowding the door of the van and shooting at their Jeep." He told everyone to "get down" as the shooting started. Siller stated that "he got a good look at all of the passengers in the van before the crash and that he could identify them if he sees them again." Siller identified one of the passengers as Glover. When Summers showed Siller a photo array, Siller positively identified Glover. He stated that he recognized the two people with Glover as Zone and TY. Although he did not personally know them, he knew their nicknames "from the street."

¶ 11     Summers also interviewed Aries Lee on September 26, 2012. Lee told him that he had left out information in a prior interview because he was scared. Lee stated that he was in the front seat of the Jeep when he heard Siller say, "Get down." Lee observed a maroon van to the left of their vehicle. The side door of the van opened and three people began shooting. The vehicle he was riding in "peeled off and up the ramp" before it struck an object and stopped. When Summers showed Lee a photo array, Lee positively identified Glover as one of the shooters in the van. Lee stated that he did not personally know the other shooters, but he knew their nicknames were Zone and TY. He stated that he could identify them if he saw them again.

¶ 12    On October 30, 2012, Summers showed Siller and Lee a photo array, and both eyewitnesses identified defendant as one of the shooters.

¶ 13    Special Agent Starlena Wilson and Special Agent Chanto Iverson testified at the hearing. Wilson testified that on October 30, 2012, she and Summers went to the McDonald's on 95th Street in Hickory Hills. They met with Siller and Lee in order to show them photo arrays. While they showed the array to Lee, Siller was in another location in the restaurant where he could not observe Lee. From the array, Lee identified defendant as one of the shooters. When the array was shown to Siller, without Lee present, Siller also identified defendant. Wilson testified that prior to their identifications, both Siller and Lee initialed advisory forms stating, "I understand that the suspect may or may not be in the lineup photo spread. I understand that I am not required to make an identification, and I do not assume that the person administering the lineup photo spread knows which person is the suspect."

¶ 14    On cross examination, Wilson acknowledged that except for one other person in the array, every participant was 8 to 10 years older than defendant. She also acknowledged that only defendant had long dreadlocks and facial hair.

¶ 15    Iverson testified that he was assigned to investigate the shooting of Porter. He stated that Siller did not give a description of the shooters on the day of the shooting, and he did not recall whether Lee provided a description. Using information gathered from the community regarding Zone and TY, Iverson obtained photographs of defendant and Mixon. Those photographs were placed into the array.

¶ 16    Defense counsel argued that the photo array was improperly suggestive because defendant was the only person with shoulder-length dreadlocks. Also, he was a teenager at the time of the

incident, and four of the remaining five people in the array were "significantly older." Additionally, defendant was the only person in the array with a "big three" tattooed on his face.

¶ 17    The State argued that the only relevant issue was whether the photo array identification was conducted in a proper manner, and the officers had followed the law at the time when assembling and conducting the array. The State further argued that there was no need for a photo lineup for identification where the witnesses knew the three defendants by their street names.

¶ 18    After viewing the photos and considering the testimony presented at the hearing, the trial court denied defendant's motion. The court found that "[t]he differences in the photographic lineup go to the weight and not to the admissibility."

¶ 19                3. Motion to Suppress Defendant's Jail Calls

¶ 20    Defendant filed a motion *in limine* to suppress phone calls between codefendants and "incarcerated individuals in custody," as well as between defendant and codefendant Glover.

¶ 21    At the hearing on the motion, the court reviewed the transcript of the phone calls, line by line, with the parties. The parties identified which lines they agreed should be redacted, and the trial court ruled on the lines that defendant argued was prejudicial to him. Relevant here, one conversation at issue discussed a shooting that occurred in Springfield, Missouri the night before defendant's arrest. The State agreed to remove references to defendant being charged with the shootings in Missouri because he was never charged with those shootings. The State also agreed to take out references to defendant being charged with "two guns" thrown from the truck before defendant "hopped out and ran." Although the State agreed not to include references to defendant being charged with the two guns, it wanted to keep statements indicating that two guns were thrown from the vehicle as defendant fled. The State argued that the conversation was relevant to show the circumstances of defendant's arrest for the Porter shooting.

¶ 22    The trial court found that the evidence "does give some context," and thus the prejudice to defendant was "substantially outweighed by the relevancy" of the evidence. The court allowed the statements for the purpose indicated by the State. The trial court also allowed defendant's statements that he "didn't get caught with the 30."

¶ 23                                    B. *Trial*

¶ 24    Outside of the jury's presence, and with attorneys for all defendants in the court room, the trial court explained how the severed jury trial would proceed.

> "I'm going to have the jury sworn in and then we will – I'll commence with the instructions and we'll proceed first with the State's opening and then the Defense. As far as the jury trial is concerned for Mr. Calvin, they will make their opening statement. I'll send the jury out after that and then the Defense may make their opening statement to me. Once we've concluded that, we'll call the first witness.
>
> As far as cross-examination is concerned [for] the bench trial defendants, once the Defense for Mr. Calvin has concluded their cross-examination, I'm going to send the jury out and then you can conduct the cross-examinations on behalf of the defendants who are having a bench trial. And that's the way we'll proceed. If there's any issues that come up regarding evidence that may be coming in against one of the bench trial defendant[s] that's an issue, I want the attorneys to let me know so we can have a side bar and I can make sure that if the jury should not hear the evidence, then that they're excluded, okay?"

Defendant's counsel informed the court that "[w]ith regards to having the cross-examination of all of them in front of the jury, again I'm neutral as to that, I don't have a problem with that. The Court has made a previous ruling." The trial court responded:

"I appreciate that, but I'm going to remain consistent with what I said initially and that is during the cross-examination of the defendants who have a bench trial, I'm going to remove the jury from the room at that time, just to make sure that there's nothing that occurs that would jeopardize the jury trial."

The matter proceeded to trial without objection.

¶ 25    Yesenia Brown testified that on September 5, 2012, around 11:40 p.m., she was driving southbound on I-94 near the 87th Street exit when a "dark burgundy van" passed her at a high rate of speed. She observed the van's door sliding open and she heard gunshots. She could not see the shooters, but she saw flashes of gunfire coming from the van. Brown called the police.

¶ 26    Lee testified that on September 5, 2012, at 11:30 p.m., he was in Siller's Jeep with Siller and Porter, going southbound on I-94. Lee was sitting in the front passenger seat, Siller was in the backseat, and Porter was driving. A van came from behind the Jeep, and Lee observed a female fire a gun out of the van's front passenger side window. He testified that he did not see any other shooters. He acknowledged that when officers interviewed him on September 6, 2012, he said that he did not see the shooters.

¶ 27    On September 26, 2012, Lee met with detectives at the police station. He testified that he did not remember telling officers that the back passenger door of the van opened and three black males began shooting out of it. He did not remember circling two people in a photo array or telling officers that he knew the shooters by their nicknames, Zone and TY. When shown an array that contained a photo of Glover, Lee acknowledged that his initials appeared on the array but stated that he did not write them. Lee denied that he identified Glover as one of the men in the van.

¶ 28    On October 30, 2012, Lee met Detectives Summers and Wilson at a McDonald's. He testified that he did not remember looking at a photo array or identifying defendant that day. When

shown a photo array and advisory form dated October 30, 2012, Lee acknowledged that his signature and initials appeared on the documents. Lee agreed that the person circled on the array was defendant, but he denied making the circle or initialing the form.

¶ 29    During cross-examination by defendant's counsel, Lee testified that he "looked up" when he heard gunshots and then he "got hit." He acknowledged that after he was shot, he "ducked down in the seat" and did not see the vehicles around him. Lee testified that he did not see where the gunshots were coming from. When he looked up after hearing gunfire, he saw a "female." Lee agreed that the entire incident "happened really fast." When presented with the photo array containing defendant's photo, Lee agreed that defendant was the only participant with dreadlocks and a tattoo on his forehead.

¶ 30    After defendant's counsel finished his cross-examination, the trial court excused the jury to allow co-defendant Mixon's counsel to cross-examine Lee. Defense counsel did not object. Mixon's counsel stated that he was adopting the cross-examination of Lee by defendant's counsel.

¶ 31    Siller testified that on September 5, 2012, he planned to celebrate the birth of Porter's child with Porter and Lee. Porter was driving Siller's Jeep on I-94, with Lee in the front passenger seat and Siller in back behind Porter. Siller sat slouching forward with his head leaning towards the driver's side window.

¶ 32    As they approached the 87th Street exit,  Siller saw a van pull up next to the driver's side of his Jeep. He wondered why the van was "so close to us." Someone in the van began shooting at the Jeep, so Siller told Porter and Lee to "get down." Siller testified that he did not "remember who was shooting." He only knew that "they were shooting from the car." Siller testified that he heard multiple shots before the Jeep crashed at the top of the 87th Street exit ramp. He could not recall anything about the shooters, nor did he remember speaking with police at the crime scene.

¶ 33 Siller testified that he spoke to detectives at the police station on September 26, 2012. He stated that he did not remember telling the detectives that he got a good look at the passengers in the van. He did not remember saying that there were five people in the van: a female driver and female passenger in the front seat, and three men in the back. He did not remember stating that he observed three black males "crowding the door in the back of the van" firing at the Jeep. He also did not remember identifying the three men as Glover, Zone and TY.

¶ 34 When the State showed Siller an array that included a photo of Glover, Siller asserted his Fifth Amendment rights. After consulting with his counsel, Siller testified that he had never seen the photo arrays or photo advisory forms identifying Glover and the two women in the van, but admitted that his signature and initials, dated September 26, 2012, appeared on the documents.

¶ 35 Siller testified that he met Officers Summers and Wilson at a McDonald's on October 30, 2012. When shown a photo array containing defendant's photo and an advisory form, Siller testified that he did not remember signing or initialing the documents. He acknowledged that the person circled in the array was Zone. He also confirmed that his signature and initials appeared on the photo array and advisory form.

¶ 36 Siller met with detectives again on November 15, 2012. He identified his signature and initials on the photo array and advisory form – both dated November 15, 2012 – identifying Mixon as an offender. Siller testified that he did not remember identifying anyone in that array, but he admitted that the person circled on the form was TY.

¶ 37 On cross-examination by defendant's counsel, Siller reiterated that he did not remember what he had told police on September 6 or September 26, 2012. He agreed that the shooting "happened quickly" and that cars were "moving quickly." He also agreed that the situation was

"scary." Siller testified that when he first heard the gunshots, he looked out the window "long enough to know somebody was shooting at me."

¶ 38    After counsel's cross-examination, the trial court excused the jury to allow Mixon's counsel to cross-examine Siller. Defendant's counsel objected to the jury being removed, arguing:

> "The state's attorney got to put in their entire direct examination of Mr. Siller, of all three defendants without removing the jury at that time and now we're selecting to take them out of the room when some of those questions may be asked that they've obviously heard—they've heard the front end of it. They are not going to hear the back end of it. So, I'm objecting to the jury being removed at this time."

The State argued that all parties had agreed to conduct the trial in this manner. Defense counsel responded:

> "I agreed to allowing them to put their case in in my case that I'm doing with my client, but *** of all three days that we've done this, they've put their entire direct examination of their identifications of Mr. Mixon and Mr. Glover that have nothing to do with my case. But they've been allowed to do this in front of the entire jury the entire time and now they get to put their front end on all these extra things that are going on and they don't get to hear the other cross-examinations."

¶ 39    The trial court agreed with the State, explaining that "we dealt with this issue before trial and I asked several times about the way we're conducting it and everybody agreed. We're not going to change it now in the middle of the trial." Defense counsel responded:

> "I was agreeing to having them, again like I said, they could put in the information, the direct examination that's pertinent to my case, but they didn't stop, they didn't stop and say, Hey, Judge, now we're going into information that is pertinent only to Mr. Glover or

only to Mr. Mixon and have the jury removed at that time. They are only being removed now during cross-examination. That's what I agreed to initially was that they would be removed for both the direct and for the cross and that has not happened."

¶ 40    The trial court overruled defense counsel's objection, finding that the trial would "continue to proceed by what we all agreed to before the trial began and what we agreed to when we began the trial." Defendant's jury did not hear Siller's cross-examination by codefendants' counsels.

¶ 41    Officer Peter Watson testified that he responded to a shooting on I-94 on September 6, 2012. He recovered six shell casings from the far righthand lane of the expressway, the shoulder, and the entrance to the 87th Street exit ramp. Four shell casings came from a .45 caliber weapon and two were 9-millimeter casings. Later, at Porter's autopsy, Watson recovered a projectile found on the body.

¶ 42    Dr. Adrienne Segovia testified that she performed Porter's autopsy. He had a gunshot wound and injuries consistent with being in a motor vehicle accident. Dr. Segovia recovered a bullet which entered from the left side of his face. She concluded that the cause of Porter's death was a gunshot wound, and his manner of death was homicide.

¶ 43    Officer John Brewer testified that on October 8, 2012, he was on patrol in his vehicle in Springfield, Missouri. Around 3 p.m., he observed a tan Ford Explorer pass him as it drove in the opposite direction. Brewer stated that "[t]wo of the occupants in it was familiar from –" when defendant's counsel objected. The trial court sustained the objection and instructed the jury that the "last part of the answer will be stricken. You are not to consider that part of the question [*sic*]."

¶ 44    Brewer testified that he began to follow the Explorer. Soon, Brewer observed that "it ran through the stop sign." He activated his police lights and siren, but the Explorer began accelerating away from him. Brewer followed and then observed the Explorer's brake lights turn on at 1638

East Dale Street. He saw a man, whom he identified in court as defendant, exit the right side of the Explorer and flee into the backyard of the house at that address. After defendant exited the vehicle, the Explorer "took off again." Brewer stopped his vehicle and chased defendant on foot.

¶ 45 Brewer testified that defendant jumped a fence behind the house and ran westbound to the back of 1616 East Dale. Defendant suddenly "cut back southbound" and Brewer apprehended him shortly thereafter. Brewer testified that although he kept defendant in sight, he could not "see all of him" because his view was partially obstructed by fences. As he brought defendant back to his police vehicle, Brewer observed a loaded .38 caliber Colt revolver on the ground "where the Ford Explorer had stopped." In court, Brewer drew a line on a map showing the route defendant took as he fled.

¶ 46 On cross-examination from defendant's counsel, Brewer stated that during the chase, he did not observe defendant "throw anything" away. When he arrested defendant, he did not find any weapons on him. Brewer testified that he did not search the area of defendant's flight, but other officers "walked the area." On the subject of the gun found where the Explorer had stopped at 1638 East Dale, the following exchange occurred:

"Q. So you found nothing else in this case other than what was indicated at 1638 East –

A. Yes, once we got back to the roadway with him was when I located that gun at the roadway where that Explorer stopped.

Q. And what you recovered there was a gun?

A. Correct.

Q. It was there. You didn't see [defendant] drop it?

A. No, I did not.

Q. And it's not the Glock 30 .40-caliber gun?

- 12 -

A. No, it wasn't.

Q. You said it was a .38?

A. It was a Colt I believe.

Q. Revolver?

A. Revolver, yes.

Q. Distinctly different than a semiautomatic, correct?

A. Yes."

Counsels for codefendants did not cross-examine Brewer.

¶ 47    Springfield Police Officer Tom Savard testified that he responded to a call on October 14, 2012, regarding a gun found at 1616 East Dale Street. An elderly man at that address directed the officer to the backyard where a .45 caliber Glock 30 firearm lay in the grass next to the chain-link fence. Savard testified that "[t]he slide was locked back on it. There was no magazine with the gun." He later discovered that the gun had been reported stolen.

¶ 48    Jon Flaskamp, a forensic scientist with the Illinois State Police, testified as a firearm expert. He compared the .45-caliber Glock 30 firearm recovered by Savard to the bullet in Porter's body and the six shell casings recovered from the scene of the shooting. Flaskamp determined that all four of the .45-caliber shell casings were fired from the Glock 30 firearm. He also determined that the two 9-millimeter casings, as well as the bullet from Porter's body, came from two different guns. The Glock 30 did not fire those bullets.

¶ 49    Officer Summers testified that he spoke with Siller and Lee shortly after the shooting, but they did not identify the shooters at that time. On September 9, 2012, Siller and Lee drove to the police station to speak with Summers. Summers' testimony regarding the identification of

defendant by Siller and Lee as one of the shooters mirrored his statements in the stipulation presented at the hearing on defendant's motion to suppress identification.

¶ 50    Summers testified that he subsequently received a .45-caliber Glock 30 firearm recovered in Springfield, Missouri. On November 1, 2012, Summers interviewed defendant in Missouri. He also obtained recordings of phone calls defendant made from jail in Missouri. He testified that he recognized defendant's voice in the recordings.

¶ 51    The State played for the jury redacted audio recordings of two phone calls defendant made to Glover on October 8, 2012. The jury also received a transcript of the recordings. Prior to the publication, the trial court instructed the jury that "[t]he electric audio recording and not the transcript is the evidence. If you perceive a conflict between the electronic audio recording and the transcript, electronic audio recording controls." The jury was instructed to consider only the unredacted portions of the exhibits, and not the reasons for the redactions.

¶ 52    In the first call, defendant tells Glover, in relevant part,

"Hey the thirty – the thirty in Nicky backdoor to the right. I didn't get with a thirty. These n*****s – these goofy ass n*****s threw the gun out the truck and they charging me with two guns bro. Uh – two thirty-eights bro."

Defendant explained to Glover that "these n*****s threw the gun out in front of the police. So I hop out and run. Bro I – I swear to God though these – these n*****s got away. So the police start chasing me when I hopped out and ran."

¶ 53    Defendant then stated that he tried to "tell [Nicky] to tell the police that I just got off the Grey Hound bus yesterday." He told Glover, "you got to go get the thirty bro. It's in Nicky [*sic*] backyard. I threw it over the fence to the right. Not the house right directly on the side of her fence but the other house. They ain't even find it." Defendant reiterated that he "did not get caught with

the thirty." However, he "got caught with two eights *** [t]hese n*****s threw guns in the middle of the street." Defendant told Glover, "I just got locked up with somebody else [*sic*] bangers. Been trying to let you know I didn't get *** caught with thirty, bro. Man but – at least he got – I – I know I got away – we got away with the nation business you feel me." Near the end of the call, defendant stated:

"So now these guns on me cuz'. They ain't no telling if they *** [gonna] find that thirty in the f****n white people backyard – yard next to – to uh – you know how it's Nicky house. So they probably – somebody [gonna] call it a minute. Like we found the gun – backyard this and that. You know what I'm saying."

¶ 54 In the second phone call, defendant again told Glover that he "didn't get caught with the thirty." He explained:

"The thirty is just in our backyard. Not her backyard but the back door – Nicky door … More to the left – like the back corner of the fence… Not the first house … that's directly on the side of her house to the left. The one next door behind that … The clip broke in the air and everything boy. I threw the m**********r right by – in the backyard. In the middle of the yard. I know I did."

¶ 55 After the phone calls were published, defendant's counsel moved for a mistrial. The trial court heard arguments outside of the jury's presence.

"[DEFENSE COUNSEL]: I'm going to make a motion for mistrial at this point. They just played to the jury whole sections of this that we agreed that we're not – talking about coming off a Greyhound yesterday, that was played on all of this.

[ASSISTANT STATE'S ATTORNEY]: If I may? We had these calls redacted according to what your orders were. They were given to counsel long ago. If he found

something that was in there that he didn't think should be there, he could have called us. We did not leave anything – I don't see what he is talking about.

[DEFENSE COUNSEL]: There was your copy of this.

[ASSISTANT STATE'S ATTORNEY]: There were a number of rough copies. We were going back and forth.

THE COURT: Just about what's been played, show me where that had been stricken or anything that was stricken that was played. I mean, you both looked at these, right, before we –

[DEFENSE COUNSEL]: Yeah, briefly.

THE COURT: Okay.

[DEFENSE COUNSEL]: I was relying on what the State gave me.

THE COURT: Well, yeah. But I mean that's –

[DEFENSE COUNSEL]: I'll go through it again.

THE COURT: All right. I guess was it an objection or what? You're looking for a mistrial?

[DEFENSE COUNSEL]: I'll review it and I'll have to address it after.

THE COURT: It's denied at this point. Let's go."

¶ 56 The trial resumed and the transcript of the audio recordings was admitted. When the court asked defendant's counsel whether he had an objection, counsel replied that he did not "[w]ith that limiting instruction you read" prior to playing the recording in court.

¶ 57 The State rested. Defendant moved for a directed finding which the trial court denied. Defendant then rested without presenting evidence.

¶ 58                                    C. *Closing Arguments*

¶ 59    In closing, the prosecutor told the jury that it could find defendant guilty of murder if it determined that he, or one for whose conduct he was legally responsible, performed the acts that caused Porter's death. He argued that the three defendants were "on a mission" when they drove next to Siller's Jeep, slid open the rear door of their van, and fired shots into the Jeep. The prosecutor argued that defendant "had a gun. He had this 30, his 30, a 45-caliber Glock 30," as he fired at the Jeep. He argued that "[o]ne of the bullets that was fired from that maroon van struck Larry Porter in the cheek. The defendant and his friends murdered Larry Porter." The prosecutor recited the law of accountability, telling the jury:

> "it's as if all three of the people in the back of that van, each one of them had their hand on each other's gun, and each one of them was shooting each one of their guns because they were all going towards the same goal. And if one of them hit, they all hit."

¶ 60    The prosecutor commented that there were "at least three guns" used in the September 5, 2012 shooting, and that four of the six shell casings recovered from the crime scene were fired by the Glock 30. Defendant fled to Springfield, Missouri after the shooting "and brought his Glock 30 with him… He brought the murder weapon." The prosecutor argued that defendant tossed the Glock 30 into the yard because he could not be caught with "the instrument of death that was used in a murder a month prior." He argued that defendant did not seem "concerned about getting charged with two guns, two 38s" because they "weren't the murder weapon." The prosecutor referred to the Glock 30 as "the murder weapon" at least 16 times during closing argument.

¶ 61    Regarding the eyewitnesses who could not remember identifying defendant as one of the shooters, the prosecutor noted that Siller and Lee knew defendant from their neighborhood. He asked the jury to consider how difficult it was to witness a violent homicide, particularly for Siller,

because the victim was driving Siller's Jeep on the night of the shooting. He argued that Siller recanted on the stand because he was probably the "intended target," and "maybe the defendant's friends were in the gallery." The trial court overruled defense counsel's objection.

¶ 62    In closing, defense counsel emphasized that the bullet that killed Porter was not fired from the Glock 30 recovered in Missouri. Counsel referred to the phone call defendant made to Glover. He explained to the jury:

> "[Defendant's] a teenager that is frantic about getting charged with another gun. He's not talking about a murder. He's not talking about a murder weapon. You can call it the murder weapon all you want, but that's not the gun that actually put the projectile into Mr. Porter. He's freaking out about a gun. And he's talking about all this stuff that's going on. He knows he's being recorded. He's talking about this guy throwing a gun out here ***. He's worried about a third gun charge. That's what he is worried about."

¶ 63    Defense counsel also challenged the reliability of Lee and Siller's eyewitness identifications. He questioned their opportunity to view the offenders under the circumstances of the shooting, the changes in their stories, and the composition of the photo array used to identify defendant.

¶ 64    In rebuttal, the prosecutor responded, "the fact that a 9 mm bullet is what killed the victim, a bullet that was fired by one of his partners in crime, that doesn't matter, ladies and gentlemen." He argued that the State did not "have to prove that it was a 45-caliber slug that ended Larry Porter's life" for defendant to be found guilty. "When three people are shooting and one of the bullets hits and kills the victim, it doesn't matter which of those three people fired that shot."

¶ 65    After deliberations, the jury found defendant guilty of first degree murder and determined that he committed the offense while armed with a firearm.

¶ 66                                    D. *Posttrial Motions and Sentencing*

¶ 67    Defendant moved for a new trial, alleging, *inter alia*, that 1) the photo arrays were improper impeachment evidence because the eyewitnesses did not remember conducting the identification procedures, 2) defendant's statements in the jail calls were improperly admitted as other crimes evidence, 3) the State improperly argued that the Glock 30 was the murder weapon, 4) his motion to suppress the jail call should have been granted, and 5) the photo array was improperly suggestive. The trial court denied the motion. Defendant filed a motion to reconsider, which the trial court also denied.

¶ 68    The matter proceeded to sentencing. At the hearing, the trial court received defendant's pre-sentence investigative report. In aggravation, the State presented testimony that in 2015 and 2016, defendant belonged to a group in jail called "Savage Life." As a member of the group, defendant caused chaos via masturbation in front of officers and nurses, resisting officers by spitting on them or digging his nails into their skin, inflicting self-harm, and using a shampoo bottle to spray urine and feces on officers. Defendant was charged in eight separate cases arising from his conduct while awaiting trial.

¶ 69    The State further emphasized the nature of the crime, noting that defendant had opened fire on one of the busiest highways in the country. The State argued that such conduct demonstrated defendant's callous disregard for human life. In her statement, Porter's sister said that defendant "hurt us in the worst way," and Porter's daughters suffered a significant loss.

¶ 70    In mitigation, defendant's pastor testified that defendant was traumatized by the brutal murder of his brother when he was a child. When defendant moved to East St. Louis, he fell into the wrong crowd. He testified that defendant had matured and grown in prison. Defendant's aunt as well as a friend testified that he was a reliable, dependable person and a role model.

¶ 71    Defense counsel argued that defendant was only 18 years old at the time of the offense, was in special education classes, and had severe mental health issues. He was also the youngest of the three codefendants and had the least extensive criminal background. Counsel argued that defendant had changed since his days as a Savage Life member:

> "And we see the change in him because all of the incidents they talked about only went up to 2016. It's been at least 6 or 7 years since he's had any new incidents or charges. I think that says a lot. He's matured. It shows. He did that program, that I Am You program. It has to do with mental health in dealing with how to cope with things and not self-harm. And he completed that in 2022, Judge. So it's showing that he's maturing and saying he needs to take control of his situation and try to make changes in his life."

¶ 72    Defendant stated in allocution that he was "sorry the situation happened for the family." He also spoke about the trauma he experienced in his youth and how he has grown during his incarceration. He told the trial court that the case was "put on" him and that he was charged "due to a statement from Garrett Glover." He emphasized that there were no fingerprints nor an in-court identification proving he killed Porter. He stated that he engaged in the Savage Life conduct to fit in as a St. Louis native in a Chicago jail.

¶ 73    In imposing defendant's sentence, the trial court stated that it had read the pre-sentence investigative report and considered all of the testimony and evidence presented at the hearing. The court found that defendant had a "very ordinary life" as a child raised by his mother. It noted that defendant was prescribed medication as a child and that his life took "a downward trend" after his brother's murder. The court acknowledged that "a number of incidents" occurred that "seemed to indicate *** psych issues and acting out, which resulted in him being placed on medication and

being part of the DCFS system." The court noted that defendant's "criminal background is not that extensive."

¶ 74    The court stated that it had "received a number of documents regarding [defendant's] time in the Cook County Jail and the different events and different programs he participated in. I also have a report regarding an incident wherein he came to the assistance of a person at the jail who needed assistance and he did that." The court acknowledged that defendant "said his time in incarceration has changed him and that he's not the same person that was involved in anything like this. In fact, he denies his involvement in it. But he says he's a changed man. I hope that's true."

¶ 75    The court found, however, that the firing of a weapon at a person on a busy expressway was a "callous act." In sentencing defendant, the trial court took "into consideration what [it] mentioned in aggravation and mitigation." Noting that the applicable sentencing range for first degree murder was 35 to 75 years in prison, including the firearm enhancement, the trial court determined that neither the minimum nor maximum sentence was appropriate. The court concluded, after "[t]aking all of what I've just indicated into consideration, I'm going to sentence the defendant to a sentence of 50 years in the Illinois Department of Corrections." The sentence included the mandatory 15-year firearm enhancement. Counsel filed an oral motion to reconsider sentence which was denied.

¶ 76    Defendant appealed his conviction and sentence.

¶ 77                                    II. ANALYSIS

¶ 78                                  A. *Severed Trial*

¶ 79    Defendant contends that he was denied a fair trial where his jury was present for the State's direct examination of Siller and Lee, but the trial court removed the jury during cross-examination by codefendants' counsels. Defendant argues that by conducting the trial in this manner, the trial

court failed to "meaningfully sever" his trial where the State presented incriminating evidence against all three defendants to support its accountability theory of the case, but the jury did not hear the weakness of the State's case against the codefendants through cross-examination.

¶ 80    As an initial matter, the record indicates that defendant acquiesced to the trial court's procedure. Prior to trial, the court clearly stated how cross-examination of the State's witnesses would proceed. The court informed the parties that:

> "As far as cross-examination is concerned [by] the bench trial defendants, once the Defense for Mr. Calvin has concluded their cross-examination, I'm going to send the jury out and then you can conduct the cross-examinations on behalf of the defendants who are having a bench trial. And that's the way we'll proceed. If there's any issues that come up regarding evidence that may be coming in against one of the bench trial defendant[s] that's an issue, I want the attorneys to let me know so we can have a side bar and I can make sure that if the jury should not hear the evidence, then that they're excluded, okay?"

¶ 81    Although defendant's counsel insisted at trial that he did not agree to the procedure, the record shows that the defense did not object when informed of this procedure before trial. In fact, when so informed, counsel explicitly acknowledged the court's ruling but made it clear that the defense was "neutral" on whether to remove the jury for cross-examination by codefendants' counsel. The trial court reiterated that it would adhere to its decision to "remove the jury from the room at that time, just to make sure that there's nothing that occurs that would jeopardize the jury trial." There was no objection. Where a party "acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby." *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989).

¶ 82    Moreover, the trial court instructed the parties to notify the court if issues arise "regarding evidence that may be coming in against" the codefendants during the trial. Defense counsel did not object when the State questioned Siller and Lee about their identifications of the codefendants. Rather, he raised an objection only when the jury was removed for cross-examination of the witnesses by codefendants' counsel. Defendant cannot now complain of error in allowing the jury to hear the State's direct examination of Siller and Lee. Although defendant insists that he did not agree to their direct examination in this manner prior to trial, nothing in the record supports his contention. Defendant, as appellant, bears the burden of presenting an adequate record to support his claim of error. *People v. Hunt*, 234 Ill. 2d 49, 58 (2009). "Any doubts stemming from an inadequate record will be construed against the appellant." *Id.*

¶ 83    Regardless, it is well-established that defendant does not have an automatic right to a severed trial. *People v. Byron*, 116 Ill. 2d 81, 92 (1987). Instead, "defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Lee*, 87 Ill. 2d 182, 187 (1981). Two recognized sources of potential prejudice are 1) interference with defendant's right of confrontation when a codefendant makes incriminating statements against defendant but does not testify, and 2) the defenses of defendant and his codefendant are "so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others ***." *People v. Bean*, 109 Ill. 2d 80, 93 (1985).

¶ 84    Here, defendant filed a motion to sever his trial based on the first source. He claimed that codefendant Glover made statements incriminating him, the State would use those statements against him, and Glover would not testify at trial. As our supreme court has noted, this problem was addressed by the United States Supreme Court in *Bruton*. Pursuant to *Bruton*, this type of

prejudice can be "cured either by severance or by *** removal of all references to the moving defendant" in the codefendant's statement. *Id*. The trial court thus granted defendant's motion.

¶ 85    Defendant, however, challenges the procedure used by the court in conducting his severed trial. He contends that due to the procedure, the jury did not hear cross-examination of the witnesses "about the same issues pertaining to [the identification of] Glover and Mixon." He concludes that he was harmed where the State was able to present the jury with unrebutted evidence regarding Mixon and Glover to support its theory that all three defendants "worked together."

¶ 86    The trial court's implementation of conditions during a severed trial is reviewed for an abuse of discretion. *People v. Ruiz*, 94 Ill. 2d 245, 259 (1982). In determining whether the jury's removal in this manner was an abuse of discretion, we consider whether the procedure prejudiced defendant so as to deny him a fair trial. *Id*.

¶ 87    Defendant does not specify how he was prejudiced by the procedure, nor do we ascertain substantial prejudice from the record. Defendant acknowledges that his counsel had the opportunity to thoroughly cross-examine Siller and Lee, in front of the jury, on the weaknesses in their prior identifications of defendant. The same weaknesses apparently applied to their prior identification of Mixon and Glover, as shown by the fact that after defendant's counsel cross-examined Lee, Mixon's counsel stated that he was adopting the cross-examination by defendant's counsel. Glover's counsel did not cross-examine Lee. If codefendants' attorneys cross-examined Siller, defendant has not indicated what Siller said differently regarding his identification of codefendants that would have aided defendant. "Mere apprehension of a particular result will not sustain an allegation of prejudice to the accused." *Ruiz*, 94 Ill. 2d at 258.[1]

---

[1] Defendant briefly mentions, without further analysis, Officer Summers' testimony regarding the photo array identifications made by Siller and Lee as similarly uncontested through cross-examination. Our

¶ 88    Defendant cites *People v. Rodriguez*, 289 Ill. App. 3d 223 (1997), to support that he was prejudiced by the trial procedure. In *Rodriguez*, witnesses had given statements prior to trial that a person named A.P. was the shooter. At trial, they recanted their prior identification and testified that the shooter was actually the defendant, and not A.P. The defendant argued that the trial court erred in joining his case with that of A.P. where they took antagonistic positions regarding the truthfulness of the witnesses' testimony. *Id.* at 235.

¶ 89    The appellate court found that even though the defendant and A.P. had separate juries, the defendant was prejudiced by the joint trial. *Id*. at 236. It reasoned that by having the defendant and A.P. jointly tried, the State received "two bites at the apple of defendant's guilt because the trial court allowed the State to first impeach its witnesses as to their initial statements," and then those impeachments were "supported by A.P.'s cross-examinations in the presence of defendant's jury." *Id*. at 237. Of interest here, the court implied that this error could have been avoided if A.P had conducted his cross-examinations outside the presence of the defendant's jury. *Id*. Instead, the defendant was denied a fair trial where he had to fight the State's case against him, as well as defend himself against A.P.'s theory of the case. *Id*.

¶ 90    The circumstances in *Rodriguez* are not present in this case. Nothing in the record indicates that defendant had to defend against Mixon's or Glover's theory of the case in front of the jury. Importantly, defendant in this case received a trial severed from his codefendants so that his jury *was* removed during the cross-examination of State witnesses by Mixon and Glover. This was a prudent course of action given that Glover had made pretrial statements incriminating defendant. Had the trial court in *Rodriguez* conducted cross-examinations in a similar manner, there would

reasoning also applies to Summers' testimony for the reasons set forth.

have been no finding of reversible error. See also *Ruiz*, 94 Ill. 2d at 258 (noting that in a case where both defendants are simultaneously tried with separate juries, and a codefendant who made incriminating statements chose not to testify, any potential prejudice to the defendant could be avoided by removing his jury during cross-examinations by the codefendant's counsel).

¶ 91    Accordingly, we find that the trial court's decision to remove defendant's jury for the cross-examinations of Siller and Lee by codefendants was not an abuse of discretion.

¶ 92                                    B. *Improper Other-Crimes Evidence*

¶ 93    Defendant next contends that he was denied a fair trial where evidence of other crimes was improperly admitted, and the jury was not given a limiting instruction.

¶ 94    Defendant contends that the State elicited improper other-crimes evidence through the testimony of Officer Brewer and recordings of phone calls defendant made to Glover. He acknowledges that he did not preserve some of his claims for review. See *People v. Denson*, 2014 IL 116231, ¶ 18 (finding that to preserve an issue for review in criminal cases, a defendant must raise it in either a motion *in limine* or an objection at trial, as well as in a posttrial motion). Defendant requests, however, that we consider the forfeited issues as plain error. The plain error doctrine permits review of clear and obvious errors where 1) the evidence is so closely balanced that the error threatens to tip the scales of justice against defendant, or 2) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before we consider plain error, we first determine whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

¶ 95    Other-crimes evidence is inadmissible not because it is irrelevant, but because it has "too much" probative value. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). "Where evidence has no value beyond the inference that the defendant has a propensity for the crime charged, the evidence

is excluded." *People v. Kimbrough*, 138 Ill. App. 3d 481, 484 (1985). Other-crimes evidence is admissible, however, if it is relevant for any purpose other than to show defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005).

¶ 96    Regarding Brewer, defendant argues that the State elicited excessive and irrelevant testimony about defendant's apprehension in Missouri. In particular, he points to Brewer's testimony that defendant was in a vehicle that fled from police, and that he jumped out of the vehicle and fled on foot. He contends that this testimony was not necessary to establish his possession of the Glock 30 and served only to prejudice him.

¶ 97    We disagree. Brewer's testimony about defendant's flight from police was relevant because it explained the circumstances surrounding the recovery of the Glock 30 and the firearm's connection with defendant. Testing of the Glock 30 revealed that some of the shell casings found at the scene of Porter's murder were fired from that weapon. Brewer's testimony about the direction defendant took as Brewer chased him was relevant because the Glock 30 was later recovered along that route. Although Brewer did not actually observe defendant throwing the firearm as he fled, the connection between the weapon and defendant may be proved by circumstantial evidence. *People v. Araujo*, 261 Ill. App. 3d 393, 395 (1994). This testimony was not other-crimes evidence. Rather, it was relevant testimony connecting the recovered Glock 30 to defendant. See *People v. Hoffstetter*, 203 Ill. App. 3d 755, 773 (1990) (finding that testimony indicating the victims were killed by .22-caliber gunshots, and that the defendant had access to a firearm that could have fired those shots at the time of the murders, was admissible as circumstantial evidence connecting the defendant to the possible murder weapon). Since we find no error in admitting Officer Brewer's testimony, there is no plain error. *People v. Hood*, 2016 IL 118581, ¶ 29.

¶ 98    Defendant also challenges Brewer's testimony regarding the Ford Explorer he observed while on patrol. He testified that "[t]wo of the occupants in it was [*sic*] familiar from –" before defendant's counsel interrupted him with an objection. Defendant argues that this testimony was highly prejudicial because the "obvious inference" was that police were familiar with defendant because he had engaged in prior criminal activity.

¶ 99    Testimony implying that familiarity with police is evidence of prior criminal conduct "is better avoided, unless somehow relevant." *People v. Bryant*, 113 Ill.2d 497, 514 (1986). We note that Brewer did not testify that *defendant* was familiar to him. Nonetheless, the State did not focus on this statement, nor did it reference the testimony again during trial. It is unlikely that this brief reference prejudiced defendant so that a new trial is warranted. See *People v. Hall*, 194 Ill.2d 305, 341-42 (2000) (finding that an isolated statement which violated an *in limine* order did not prejudice the defendant's case such that a mistrial should have been declared). Furthermore, the trial court sustained defense counsel's objection and instructed the jury that the "last part of the answer will be stricken. You are not to consider that part of the question [*sic*]." A court can usually cure any resulting harm by sustaining an objection to the inadmissible statement and instructing the jury to disregard what it had heard. *Id.* at 342.

¶ 100   Regarding defendant's phone calls from jail, defendant had filed a motion *in limine* to suppress the calls, challenged the recordings at trial, and included the issue in a posttrial motion. Therefore, this claim is preserved for review.

¶ 101   Defendant contends that statements concerning the two .38 caliber firearms thrown from the vehicle as defendant fled, and statements that he had told others to provide a false alibi for him, constituted inadmissible other-crimes evidence. However, evidence that defendant attempted to establish a false alibi is generally admissible to show consciousness of guilt. *People v. Hansen*,

327 Ill. App. 3d 1012, 1018 (2002). As such, defendant's statement pertaining to a false alibi was not inadmissible other-crimes evidence.

¶ 102    As for statements regarding the two firearms thrown from the vehicle, the record does show that the State agreed to redact any mention of defendant being charged with those weapons. The record also shows that defense counsel may have decided during trial to use those statements to benefit defendant. In his closing argument, defense counsel sought to distance defendant from the Glock 30, the weapon connected to Porter's murder. Counsel explained to the jury that the phone calls showed a teenager who was  "frantic about getting charged with another gun. He's not talking about a murder. He's not talking about a murder weapon." Rather, defendant was "talking about this guy throwing a gun out here ***. He's worried about a third gun charge. That's what he is worried about." Defendant cannot complain of error in admitting statements that he was being charged with the two .38 weapons when he used the same evidence to support his case.

¶ 103    Since we have found no improper admission of other-crimes evidence, we need not address defendant's argument that the trial court should have instructed the jury to consider other-crimes evidence only for a limited purpose, or that defendant's trial counsel was ineffective for failing to request such an instruction.

¶ 104                                C. *Suggestive Photo Array*

¶ 105    Defendant next contends that the trial court erred when it denied his motion to suppress his identification by witnesses made pursuant to an unduly suggestive photo array. Defendant bears the initial burden of proving that the identification procedures used were unnecessarily suggestive and, as a result, there was a substantial likelihood of irreparable misidentification. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. If he makes this showing, the burden then shifts to the

State to show "by clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999).

¶ 106    When reviewing the trial court's ruling on a motion to suppress, we accord great deference to the court's fact findings and will reverse only if those findings are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A finding is manifestly erroneous if it is unreasonable, arbitrary, or not based on the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review the trial court's ultimate determination to deny the motion *de novo*. *Id.*

¶ 107    Defendant argues that the photo array used to identify him was impermissibly suggestive where he was the only individual with shoulder-length dreadlocks, the other participants except for one person were 8 to 10 years older than him, and he was the only individual with a facial tattoo. As support, defendant cites *People v. Maloney*, 201 Ill. App. 3d 599 (1990).

¶ 108    In *Maloney*, the court found that the lineup used to identify the defendant was unduly suggestive where, in addition to the differences in weight and size between the defendant and the participants, the defendant appeared disheveled in wrinkled, soiled clothing, he wore shoes without socks, and his hair was uncombed. *Id.* at 606. In contrast, the other participants were well-groomed, dressed in clean, pressed clothing, and wore footwear with socks. The court emphasized that "[n]either mere words nor a black and white reproduction of the photograph can adequately convey the inherent unfairness of the lineup ***." *Id.*

¶ 109    The extreme differences observed in the *Maloney* lineup are not found here. It is well-established that participants in a lineup need not be physically identical to satisfy due process. *People v. Simpson*, 172 Ill. 2d 117, 140 (1996). While "fillers" should not appear "grossly dissimilar" to the defendant, Illinois courts have consistently held that differences in hairstyle or age among the participants do not necessarily render the array impermissibly suggestive. *People*

*v. Smith*, 2023 IL App (1st) 181070, ¶ 38; *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) (finding that the lineups were not unduly suggestive where the defendant was the only individual with an Afro hairstyle in one lineup and French braids in another); *People v. Guest*, 166 Ill. 2d 381, 398 (1995) (finding that although the defendant was 35 years old and the other individuals in the lineup were 18 to 22 years old, "[t]his age difference, by itself, does not establish that the lineup was unnecessarily suggestive"). Whether a photo array was improperly suggestive and conducive to irreparable misidentification depends on the totality of the circumstances. *Simpson*, 172 Ill. 2d at 140.

¶ 110   The record on appeal contains the photo array used in this case. All of the participants were of the same race, and two others had similar hairstyles. The difference in ages did not make the participants appear grossly dissimilar. Regarding defendant's facial tattoo, it appears as a small, uncolored mark on his face. The trial court did not discern significant distinctions in the photos. As the trial court reasoned, differences in age, size or appearance affected the weight of the identification and not necessarily its admissibility.

¶ 111   *Smith*, 2023 IL App (1st) 181070, ¶ 38. Considering the totality of the circumstances of the array, the trial court's determination was not against the manifest weight of the evidence. Since defendant failed to meet his burden, the trial court did not err in denying his motion to suppress identifications made pursuant to the array.

¶ 112                          D. *Improper Prosecutor Comments*

¶ 113   Defendant contends that he was denied a fair trial where the prosecutor misstated during closing argument that defendant was caught with the "murder weapon" and remarked, without supporting evidence, that Siller was intimidated by defendant's friends who were in the courtroom. Reviewing courts follow a two-step process for determining whether a prosecutor's alleged

misconduct during closing argument constitutes reversible error. *People v. Williams*, 2022 IL 126918, ¶ 41. First, we determine whether the prosecutor's comment was improper. *Id*. If it was, we then consider whether the comment "was so prejudicial that real justice was denied or the verdict resulted from the error." *Id*.

¶ 114 A prosecutor "has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *Id.*, ¶ 44. It is improper, however, for the prosecutor to argue assumptions or statements of fact not based on the evidence. *People v. Chavez*, 327 Ill. App. 3d 18, 27 (2001). When considering the propriety of prosecutor comments, we view the challenged remarks in their entirety and in the context of the parties' closing arguments as a whole. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007).

¶ 115 Defendant argues that the prosecutor misstated the evidence when he repeatedly referred to the Glock 30 as the "murder weapon," but evidence showed that the firearm did not match the bullet recovered from Porter's body. Defendant concedes that he did not object to these comments at trial. Before we engage in plain error analysis, however, we must determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 116 The prosecutor never stated that the Glock 30, a .45 caliber weapon, actually fired the bullet that killed Porter. During closing argument, the prosecutor acknowledged that "a 9 mm bullet is what killed the victim." He explained that defendant was charged with first degree murder on a theory of accountability. "[I]t's as if all three of the people in the back of that van, each one of them had their hand on each other's gun, and each one of them was shooting each one of their guns *** . And if one of them hit, they all hit." Within the context of the prosecutor's argument as a

whole, the Glock 30 could be the "murder weapon" if it was one of the weapons that fired shots at Porter.

¶ 117   Evidence at trial connected the Glock 30 firearm to the Porter shooting. Flaskamp testified that all four of the .45-caliber shell casings recovered from the crime scene were fired from the Glock 30. Officer Brewer's testimony linked defendant to the firearm, which was recovered in Missouri. Siller and Lee identified defendant from a photo array as one of the individuals they saw shooting from the van. We find that the prosecutor's comments were properly based on the evidence. See *People v. Jackson*, 333 Ill. App. 3d 962, 969 (2002) (finding that where the defendant was charged on a theory of accountability, remarks that "they took what they wanted" and "they left" after "they had killed the only two witnesses who could identify them" did not mislead the jury, even though the defendant was not alleged to have committed the actual acts).

¶ 118   Defendant cites *People v. Giangrande*, 101 Ill. App. 3d 397 (1981) as support, but we find that case unpersuasive here. In *Giangrande*, the court found that the prosecutor overstated the evidence by concluding that the defendant's hair was found on the tape of a box containing body parts. *Id*. at 402-03. The evidence presented at trial, however, was that the hairs merely "exhibited characteristics consistent with the known hair standards of defendant." *Id*. at 400. As we discussed, the prosecutor did not overstate the evidence when he referred to the Glock 30 as the murder weapon. We find no error here and thus, no plain error.

¶ 119   Defendant also challenges the prosecutor's comments implying that defendant's friends intimidated Siller at trial. Comments in closing argument must be viewed in their context and not in isolation. *People v. Nicholas*, 219 Ill. 2d 104, 122 (2005). The prosecutor's comments, in context, were as follows:

" *** That car, that black Jeep that Shamaree Siller was in the back seat of, that wasn't his usual seat in that car. Why? Because it was his car. It was the car he typically drove. He drove that car. He was supposed to be the driver. For all he knows, he was the intended target. Maybe another reason why he didn't want to get up on that witness stand and start talking and start telling you what he told the police, those statements of identification back in 2012.

Now, it's not about being a snitch. That's not what this is about. Think about it. Think how difficult it is for a witness to come through those doors, walk down, and sit in this stand. All eyes on them. They didn't choose to be here. They didn't choose to be a witness to this crime, but they're here. They're in the witness stand.

Maybe the defendant's friends were in the gallery."

¶ 120   Defendant argues that the last remark was improper, citing *People v. Mullen*, 141 Ill. 2d 394 (1990). In *Mullen*, the prosecutor's statement "clearly" suggested that the defendant had threatened or intimidated witnesses so they would not testify against him, but there was no evidence that he had threatened any witness. *Id*. at 405. The supreme court found such a statement to be inflammatory and highly prejudicial to the defendant. *Id*.

¶ 121   However, in *People v. Williams*, 192 Ill. 2d 548 (2000), our supreme court emphasized that comments suggesting the defendant had threatened witnesses could be proper with evidence to support them. In *Williams*, the prosecutor commented that the defendant intimidated the witnesses during trial. *Id*. at 572. The supreme court found the remark an "acceptable inference" from evidence showing that the defendant had previously threatened to kill the witnesses. *Id*. It found *Mullen* distinguishable because, unlike *Mullen*, there was evidence of prior witness intimidation by the defendant. *Id*. at 573-74.

¶ 122 The prosecutor in this case never suggested that defendant or his friends actually intimidated or threatened Siller at trial. Rather, he implied that Siller *felt* intimidated while testifying in court because he feared he may have been the true target of the shooting. That comment was a reasonable inference from the evidence, which showed that Porter was shot and killed while driving Siller's Jeep. Even if the comments were improper, they were not so prejudicial that justice was denied or that the jury's verdict resulted from the error. See *Williams*, 2022 IL 126918, ¶ 41. The limited comments comprised less than one page of the transcript in the prosecutor's lengthy closing argument. As a result, any impact on the jury was likely minimal. *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 123 Defendant listed several other prosecutor statements which he argued were either inaccurate or not based on the evidence. However, he provided no further argument with citations to authority, nor did he specify how these specific remarks, if improper, prejudiced him. A point raised in a brief but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) and is forfeited. *People v. Lacy*, 407 Ill. App. 3d 442, 459 (2011).

¶ 124                                   E. *Excessive Sentence*

¶ 125 Defendant's final contention is that, given his young age at the time of the offense, his sentence was excessive where the trial court sentenced him to a *de facto* life sentence of 50 years in prison, and it did not apply the *Miller* mitigating factors codified in section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2022)).

¶ 126 A *de facto* life sentence is one that is more than 40 years and does not provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *People v. Buffer*, 2019 IL 122327, ¶ 41. Although defendant received a sentence of 50 years, he was 18 years old

when the offense was committed and thus will be "eligible for parole review by the Prisoner Review Board after serving 20 years or more" of his sentence. 730 ILCS 5/5-4.5-115 (b) (West 2022). Since defendant has a meaningful opportunity to obtain release after serving less than 40 years, his 50-year sentence is not a *de facto* life sentence. See *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56 (finding that the defendant was not given a *de facto* life sentence where he would be eligible for parole after serving 20 years).

¶ 127   Furthermore, section 5-4.5-105 of the Code applies only to someone who "is *under* 18 years of age at the time of the commission of the offense." (Emphasis added.) 730 ILCS 5/5-4.5-105(a) (West 2022); *Buffer*, 2019 IL 122327, ¶ 36. Because defendant was 18 years old at the time of the offense, this provision did not apply to his sentencing. We can, however, consider whether defendant's sentence was excessive in light of his age, mental health, and rehabilitation potential.

¶ 128   The Illinois Constitution requires that all sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. (1970) art. I, § 11; 730 ILCS 5/1-1-2 (West 2022). When a sentence falls within the range prescribed by the General Assembly, it is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 47.

¶ 129 In determining an appropriate sentence, the trial court considers factors such as "defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 528-29 (2001). A sentence is excessive if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). Having observed the proceedings, the trial court is in a much better position to weigh the relevant sentencing factors. *People v. Alexander*, 239 Ill.

2d 205, 212-13 (2010). Accordingly, a reviewing court gives great deference to the trial court's sentence and will not reverse that determination absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30.

¶ 130　The record shows that the trial court considered defendant's age, his criminal history, and his mental health struggles. It recognized that defendant had completed programs while incarcerated and that he asserted he has "changed." However, the court found that the shooting of Porter on a public highway was a "callous act." Although defendant argues that the trial court should have given more consideration to his potential for rehabilitation, "[a] defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense." *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). Moreover, we must not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The trial court weighed the proper factors and defendant's sentence was well within the applicable sentencing range of 35 to 75 years. We find that defendant's 50-year sentence was not excessive, and the trial court did not abuse its discretion in imposing such a sentence.

¶ 131　　　　　　　　　　　　III. CONCLUSION

¶ 132　For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 133　Affirmed.